Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/17/2022 08:09 AM CDT

State of Nebraska, appellee, v.
John A. Drake, appellant.

___ N.W.2d ___

Filed March 25, 2022.    No. S-21-179.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Statutes: Appeal and Error.** Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.

3. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

4. **Effectiveness of Counsel: Appeal and Error.** In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

5. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection.

6. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Appeal and Error.** The second tier of police-citizen encounters, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. This type of encounter is considered a seizure sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.

7. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Arrests: Search and Seizure: Probable Cause.** The third tier of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

8. **Sentences: Prior Convictions: Habitual Criminals: Proof.** In a habitual criminal proceeding, the State's evidence must establish with requisite trustworthiness, based upon a preponderance of the evidence, that (1) the defendant has been twice convicted of a crime, for which he or she was sentenced and committed to prison for not less than 1 year; (2) the trial court rendered a judgment of conviction for each crime; and (3) at the time of the prior conviction and sentencing, the defendant was represented by counsel or had knowingly and voluntarily waived representation for those proceedings.

9. **Statutes.** It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

10. **Effectiveness of Counsel: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the ineffective assistance of trial counsel issue will be procedurally barred.

11. **Effectiveness of Counsel: Records: Appeal and Error.** Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. Conversely, an ineffective

assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.

12. **Postconviction: Effectiveness of Counsel: Appeal and Error.** The necessary specificity of allegations of ineffective assistance of trial counsel on direct appeal for purposes of avoiding waiver requires, at a minimum, allegations of deficient performance described with enough particularity for an appellate court to make a determination of whether the claim can be decided upon the trial record and also for a district court later reviewing a potential petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.

13. **Effectiveness of Counsel: Appeal and Error.** Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.

Appeal from the District Court for York County: James C. Stecker, Judge. Affirmed.

Jerry D. Clinch and Steven B. Fillman, of Fillman Law Offices, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Heavican, C.J.

## I. INTRODUCTION

John A. Drake was arrested in December 2018 in York County, Nebraska, after methamphetamine and drug paraphernalia were found in his vehicle and on his person. Drake's motion to suppress evidence seized during his arrest was denied. After a stipulated bench trial, the district court found Drake guilty of possession of a controlled substance and found him to be a habitual criminal under Neb. Rev. Stat. § 29-2221 (Reissue 2016). Due to his enhanced sentence, the court sentenced Drake to a term of 10 to 12 years' incarceration. Drake appealed, challenging the denial of his motion to suppress,

challenging the enhancement of his sentence, and alleging ineffective assistance of trial counsel. We affirm.

## II. FACTUAL BACKGROUND

As noted above, Drake was arrested by a York County sheriff's deputy, Korey Goplin, on December 28, 2018, after methamphetamine and drug paraphernalia were found in his vehicle and on his person. In March 2019, the York County Attorney's office charged Drake with possession of a controlled substance with intent to distribute methamphetamine, possession of a controlled substance, and being a habitual criminal under § 29-2221. The York County public defender was thereafter appointed as counsel for Drake. Drake waived his right to speedy trial and the matter was set for a jury trial to commence on August 20, 2019, in the district court for York County.

On August 14, 2019, Drake moved to suppress evidence obtained as a result of the traffic stop. Drake's counsel attached an affidavit to the motion, stating that he was aware the motion to suppress was not filed more than 10 days prior to trial as required by law, unless permitted by the court for good cause shown. Counsel requested the court find good cause, stating that he had previously given verbal notice to the court and to the State on August 6 and that the failure to timely file the motion to suppress was exclusively counsel's responsibility due to an "inability to adjust [to] an unusually heavy workload." The district court granted such leave and scheduled a hearing on the motion to suppress to be held on August 22, with a jury trial to immediately follow.

At the suppression hearing, the State called Goplin, who testified that on December 28, 2018, he came upon a green Buick traveling northbound on Road E, south of Interstate 80 between York and Henderson, Nebraska, at very slow speeds. Goplin followed the Buick for a short time and "ran its license plate" to check whether the it was stolen. During this time, the Buick turned southbound down a dead-end road which led to a residence. Goplin testified that there had recently been

multiple thefts in the county, so he became suspicious of the Buick when it stopped in a residential driveway late at night, yet no one exited the vehicle.

Goplin returned to the intersection of Road E and Road 8, keeping the Buick in his sight. The Buick left the residence and returned to the intersection of Road E and Road 8, turning southbound on Road E. Goplin again followed the Buick for a short period of time, when suddenly the Buick stopped in the middle of Road E. Goplin parked his cruiser behind the Buick to make contact with the driver, Drake.

Upon contact, Goplin asked Drake "what he was doing back at the residence because [Goplin] didn't see anybody get out of the vehicle." Drake informed Goplin that he "just dropped off a friend named Candace Powers." Goplin was familiar with Candace Powers and knew she did not live at that residence. During this conversation, Drake stated, seemingly unprompted, that "it's been a long time since [I've] been in trouble with law enforcement." Goplin returned to his cruiser to check the status of Drake's driver's license, which indicated that Drake had a valid driver's license and no arrest warrants, but had a history of drug possession. Goplin then activated his cruiser's emergency lights before returning to the Buick, stating that he did so due to road conditions and the position of the vehicles in the middle of the roadway.

Upon returning to Drake's vehicle, Goplin reiterated to Drake that he was not stopped and that Drake had stopped on his own. Goplin continued to question Drake about his activities that night, asking individual questions regarding whether Drake had any weapons, drugs, or weapons of mass destruction in the vehicle. According to Goplin, when Drake was specifically asked about drugs, Drake broke eye contact and looked down, which indicated to Goplin that Drake may be engaged in criminal drug activity.

During this time, Drake stated he was lost and trying to get home. Goplin thought this was suspicious because Drake had also said he dropped a friend, Powers, off at her home, whom Goplin knew did not live at the home Drake had just

visited. Drake also said that he had previously driven from his home in Aurora, Nebraska, to Powers' actual house multiple times, and he even described the directions from Aurora to Powers' house. Goplin thought "it was odd that Drake would be lost if he knew the route."

Goplin asked Drake to exit the vehicle and come to his cruiser due to the cold temperature outside. Drake then grabbed his jacket in a way which appeared to Goplin "as if he was trying not to disturb the contents within it, instead of just jumping out and picking it up." Goplin asked if he could search Drake's person, which Drake refused.

Drake got into the front passenger seat of Goplin's cruiser, at which time Goplin asked Drake about whether drugs were in the Buick. Drake would not answer directly, and instead, he stated that the vehicle belonged to his boss. Drake refused consent to search the vehicle upon that basis. Goplin informed Drake that because he was in control of the vehicle, he could give consent to search the vehicle, but Drake refused. Goplin asked if Drake would be willing to wait for a "drug dog" to do a "sniff of the vehicle," and Drake agreed.

While waiting for the drug dog to arrive, Goplin did not affirmatively tell Drake that he was free to go, but also did not inform Drake that he could not leave. Goplin recalled that Drake did not ask whether he was being detained and did not revoke consent to the search of the vehicle.

Thirty-nine minutes later, another York County sheriff's deputy, Robert Penner, arrived with the drug dog, which alerted that drugs were located in the vehicle. Goplin searched the vehicle and found multiple small baggies consistent with the distribution of controlled substances. Goplin then searched Drake's person. Inside Drake's jacket, Goplin found a sunglasses case with 5 grams of suspected methamphetamine, a pipe, and a straw. Goplin arrested Drake. Testing later confirmed that the substance was methamphetamine.

On cross-examination, Goplin indicated that detained motorists typically wait an average of 20 minutes for "arrival of

[a] drug dog for a sniff search." Goplin also stated that although the road conditions were hazardous and there was 1 to 2 inches of snow on the ground, the road was not completely snow covered so it was suspicious that Drake was traveling only about 25 miles per hour. Goplin testified that during the 39 minutes he and Drake waited for the drug dog to arrive, they had short conversations about Drake's job, why he was driving his boss' vehicle, and what had happened to his vehicle. Penner testified after Goplin, providing a similar account of events.

Drake then took the stand to testify. Drake stated that he was lost when he turned down the driveway and that there had been no signs indicating that it was a driveway or a dead end. He had seen Goplin following him before turning down the dead-end road, and upon returning to the main road, he saw that Goplin was following him for a second time, so Drake decided to stop "to let him know what was going on." After Drake gave his driver's license to Goplin, Goplin turned on his cruiser's emergency lights. Drake stated that Goplin returned and told Drake "everything was fine there and he just wanted to ask [Drake] some questions." However, Drake testified that after Goplin had turned his cruiser's emergency lights on and asked Drake to "join him in his vehicle," Drake believed he was being detained. Drake stated that he did ask if he was free to go, to which Goplin "would not reply but changed subjects."

The court overruled Drake's motion to suppress after making specific findings on the record as follows:

> That it was a voluntary stop by [Drake]; that [Drake] then violated the law by stopping his vehicle in the middle of the road, impeding traffic, a violation of Nebraska law. The community caretaker provision with [Drake's] stopping late at night in cold weather is also applicable. [Drake's] behavior by driving slow late at night, driving into a dead end and not being a local vehicle was suspicious. The contact initially was voluntary. [Drake] when meeting with [the] officer gave suspicious answers. The [o]fficer knew the residence of Candace Powers,

knew that it was not Candace Powers' residence and that he did know Candace Powers and that [Drake] had said that he had been to Candace Powers' many times but yet that he was lost. Those [are] suspicious answers. [Drake] indicated that [the Buick] was not his vehicle. There was no evidence of permission for him to drive the vehicle, therefore he had no standing to object to the search. [Drake] agreed to wait for the drug dog. He was never arrested, not cuffed and never detained. He did consent to wait for the drug dog. That consent was never withdrawn. The dog was deployed, did alert and indicate, and at that point reasonable suspicion existed. . . . During the search baggies were found. [Drake] had a drug history. [Drake] acted suspiciously by the way he picked up and held his jacket. The officer had reasonable suspicion that a crime was afoot. The officer had probable cause to search.

Following a stipulated bench trial, the court found Drake not guilty of count I, possession of a controlled substance with intent to distribute, and guilty of count II, possession of a controlled substance. An enhancement hearing was subsequently held, after which the court found Drake to be a habitual criminal pursuant to § 29-2221. Drake was sentenced to a term of 10 to 12 years' imprisonment.

The record indicates that after sentencing, Drake's counsel failed to perfect an appeal. Drake then submitted a petition for postconviction relief, and the district court found that this failure had denied Drake an opportunity to appeal the court's October 2019 ruling. The district court reinstated Drake's right to appeal on February 8, 2021, and Drake thereafter perfected an appeal. We subsequently moved this case to our docket.

On appeal, Drake challenges the district court's denial of his motion to suppress on the basis that the stop was not consensual and that Drake believed he was being detained.

Drake also challenges the court's enhancement of his sentence, arguing that the State must have presented evidence

that Drake "was sent to prison for a fixed period of time of not less than one year and that at least one year was served in prison," in order to satisfy § 29-2221.[1] According to § 29-2221, a defendant must have "been twice convicted of a crime, sentenced, and committed to prison . . . for terms of not less than one year."

In addition, Drake's appellate counsel is different than his trial counsel, and Drake alleges several instances of ineffective assistance of trial counsel.

## III. ASSIGNMENTS OF ERROR

On appeal, Drake assigns that the district court erred in (1) denying Drake's motion to suppress; (2) finding Drake to be a habitual criminal pursuant to § 29-2221; and (3) finding that Drake received ineffective assistance of trial counsel because trial counsel (a) failed to file and schedule a timely motion to suppress, (b) failed to request certain discovery prior to trial, (c) failed to subpoena witnesses necessary to provide foundation for exhibits, (d) agreed to a stipulated bench trial with stipulated facts, and (e) generally lacked the training and experience for purposes of acting as public defender.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[2] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[3]

---

[1] Brief for appellant at 17.

[2] *State v. Lowman*, 308 Neb. 482, 954 N.W.2d 905 (2021); *State v. Briggs*, 308 Neb. 84, 953 N.W.2d 41 (2021).

[3] *Id.*

[2] Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.[4]

[3,4] Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.[5] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[6]

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

On appeal, Drake argues that the trial court erred in denying his motion to suppress. Drake asserts that the stop which occurred on December 28, 2018, was not voluntary and that thus, the evidence obtained as a result of that stop was obtained in violation of the Fourth Amendment. Drake claims that Goplin followed him long enough to "prompt[]"[7] Drake to stop his vehicle; that Goplin questioned Drake "in earnest,"[8] which intimidated Drake; that Goplin then turned on his cruiser's emergency lights in a manner that led Drake to believe that he was being detained; and finally, that as they waited for the

---

[4] *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020); *Griffith v. Nebraska Dept. of Corr. Servs.*, 304 Neb. 287, 934 N.W.2d 169 (2019).

[5] *State v. Lowman, supra* note 2; *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

[6] *State v. Lowman, supra* note 2; *State v. Lang*, 305 Neb. 726, 942 N.W.2d 388 (2020), *cert. denied* ___ U.S. ___, 141 S. Ct. 415, 208 L. Ed. 2d 119.

[7] Brief for appellant at 12.

[8] *Id.* at 13.

drug dog to arrive, Goplin refused to tell Drake whether he was free to go.

[5-7] Under Nebraska law and the law regarding seizures in the context of the Fourth Amendment, there are three tiers of police-citizen encounters.[9] As we have previously stated:

> The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection.
>
> The second tier, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*, is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. This type of encounter is considered a seizure sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.
>
> The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.[10]

### (a) First-Tier Police-Citizen Encounter

#### (i) Voluntary Stop

According to the record, Goplin was on patrol in the area when he noticed Drake's vehicle driving at slow speeds, around 25 miles per hour, which was slower than Goplin would expect given the weather conditions. Goplin followed the vehicle

---

[9] See *State v. Lowman, supra* note 2.

[10] *Id.* at 491-92, 954 N.W.2d at 916.

to check the license plate, which is standard practice. When the vehicle went down a dead-end road, Goplin kept the vehicle in his sight but did not follow. Once the vehicle returned to the main intersection, Goplin again followed, but did not activate his cruiser's emergency lights or indicate that the vehicle needed to stop.

While Drake says that he stopped only because Goplin's actions "prompt[ed]"[11] him to do so, Drake still chose to stop in the middle of the road instead of pulling over or onto the shoulder. At this point, Goplin made contact with Drake, but informed him that he had not been stopped and that Drake had stopped on his own. Goplin questioned Drake about what he was doing that night but did not detain Drake, and Goplin even told Drake that "everything was fine" and that he just had a few questions.

When Goplin later asked Drake if he would consent to a search of his person or of the vehicle, Drake refused both. Drake refused consent to the search of the vehicle because he claimed it was not his own, and he continued to refuse consent even after Goplin explained that he could give consent even though it was not his vehicle, if that is what Drake wanted to do. Drake's continued refusal to consent to a search supports the district court's determination that the contact was voluntary, and we find that determination to not be clearly erroneous.

### (ii) Waiting for Drug Dog

According to the district court, Drake later agreed to wait for a drug dog, consented to the drug dog's performing a search of the vehicle, and never withdrew such consent. The district court also found that Drake was never detained during this time.

Goplin testified that Drake was seated in Goplin's cruiser in the front seat with an unlocked door and that he asked Drake to join him in his cruiser because the cold temperatures did not allow Goplin and Drake to wait outside. Drake also testified

---

[11] Brief for appellant at 12.

that Goplin, after checking Drake's driver's license and returning to Drake's vehicle, "said that everything was fine" and "he just wanted to ask [Drake] some questions." Drake stated that he "had to turn almost at a 45 to talk to [Goplin]" and that when Drake did so, the front lights of the cruiser reflected off the Buick's rearview mirror into his eyes. This is when Goplin asked Drake if he "would join him in his vehicle."

Drake asserts that while he was in Goplin's cruiser waiting for the drug dog to arrive, he asked Goplin if he was free to go, and that Goplin "would not reply" or would change subjects. By contrast, counsel for Drake asked Goplin definitively, "[d]id [Drake] ever ask you whether he was free to leave?" to which Goplin responded, "No." Goplin also testified that he had informed Drake multiple times he had not been stopped and that he "reiterated [he] had not conducted a traffic stop" on Drake and "[i]f [Drake] was being detained, I would have told him he was detained."

Based on this evidence and testimony, the district court determined that Drake was never detained, implicitly finding Goplin to be a more credible witness than Drake. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.[12] Because these findings are supported by the record and testimony, they are not clearly erroneous.

### (iii) 39-Minute Wait

Drake further argues that his waiting for at least 39 minutes for the drug dog to arrive is evidence that he was unreasonably detained. The evidence and testimony within the record show that Drake voluntarily consented to wait; thus, Drake's waiting 39 minutes did not transform an otherwise voluntary interaction into a detention. But we note that even if Drake had been detained during the 39-minute wait for the drug dog to arrive, such period of time would not be unreasonable.

---

[12] See *State v. Lowman, supra* note 2.

We have previously held that an investigatory stop lasting 34 to 45 minutes was not unreasonable for purposes of the Fourth Amendment.[13] And investigatory stops lasting 50 minutes or longer have been upheld in several federal courts. For example, in *U.S. v. Hardy*,[14] the court determined that a wait of 50 minutes for the arrival of a drug dog was not unreasonable for Fourth Amendment purposes. In *U.S. v. White*,[15] the court determined that a 1-hour-20-minute wait for the arrival of a drug dog was not unreasonable for Fourth Amendment purposes, and in *U.S. v. Bloomfield*,[16] the court held that a 1-hour wait for arrival of a drug dog was not unreasonable for Fourth Amendment purposes.

The testimony of both Goplin and Penner indicates that Penner was awoken in the middle of the night and had to travel to where Goplin and Drake were located for the drug dog to perform the search, each a reasonable explanation for this period of delay. Thus, even if Drake had been detained, a 39-minute wait would not be unreasonable for purposes of the Fourth Amendment.

Because the vehicle stop was voluntary and Drake was not detained, the initial interactions between Goplin and Drake placed no restraint on Drake's liberty. Drake's interaction with Goplin was elicited through noncoercive questioning. Hence, these early interactions are best defined as a first-tier police citizen encounter outside the protections of the Fourth Amendment.

(b) Second-Tier Police-Citizen Encounter

When the drug dog arrived to perform a "free air sniff" of the vehicle, it indicated and alerted to the presence of drugs. Drake was detained, and at this time, the interaction evolved

---

[13] See *State v. Soukharith*, 253 Neb. 310, 570 N.W.2d 344 (1997).

[14] See *U.S. v. Hardy*, 855 F.2d 753 (11th Cir. 1988).

[15] See *U.S. v. White*, 42 F.3d 457 (8th Cir. 1994).

[16] See *U.S. v. Bloomfield*, 40 F.3d 910 (8th Cir. 1994).

into a second-tier police-citizen encounter. Goplin had a reasonable suspicion to believe a crime had occurred based on the totality of the circumstances, as well as probable cause to believe that contraband or evidence of a crime would be found in Drake's vehicle. On that basis, Goplin was permitted to detain Drake per *Terry v. Ohio*,[17] and because Drake's vehicle was readily mobile, the automobile exception applied to permit a warrantless search of the vehicle.[18] Thus, when Goplin detained Drake and executed a warrantless search of Drake's vehicle, evidence obtained as a result was not obtained in violation of the Fourth Amendment.

Upon finding contraband and drugs in Drake's vehicle, a search of Drake's person was permitted pursuant to the exception to the warrant requirement for searches incident to a valid arrest.[19] Evidence obtained as a result of this search also was not obtained in violation of the Fourth Amendment.

Based on a review of the record, the initial interactions between Goplin and Drake were consensual, the "free air sniff" by the drug dog was consensual, and the evidence obtained as a result of both a search of Drake's vehicle and his person was not obtained in violation of the Fourth Amendment.

Because the district court's findings of historical fact were not clearly erroneous and because we find no Fourth Amendment violation, we conclude the court properly overruled Drake's motion to suppress.

## 2. Habitual Criminal

In his second assignment of error, Drake asserts that the district court erred in finding Drake to be a habitual criminal for purposes of enhancing his sentence. Drake argues that the plain language of the habitual criminal statute, § 29-2221, requires that the State's evidence in a habitual criminal proceeding

---

[17] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[18] See *State v. Lowman, supra* note 2.

[19] See *id.*

must establish by a preponderance of the evidence that Drake "was sent to prison for a fixed period of time of not less than one year and that at least one year was served in prison."[20]

According to § 29-2221:

(1) Whoever has been twice convicted of a crime, sentenced, and committed to prison, in this or any other state or by the United States or once in this state and once at least in any other state or by the United States, for terms of not less than one year each shall, upon conviction of a felony committed in this state, be deemed to be a habitual criminal and shall be punished by imprisonment in a Department of Correctional Services adult correctional facility for a mandatory minimum term of ten years and a maximum term of not more than sixty years[.]

[8] We have further noted:

In a habitual criminal proceeding, the State's evidence must establish with requisite trustworthiness, based upon a preponderance of the evidence, that (1) the defendant has been twice convicted of a crime, for which he or she was sentenced and committed to prison for not less than 1 year; (2) the trial court rendered a judgment of conviction for each crime; and (3) at the time of the prior conviction and sentencing, the defendant was represented by counsel or had knowingly and voluntarily waived representation for those proceedings.[21]

In construing § 29-2221, Drake relies on the Black's Law Dictionary definitions of the word "commit"—"[t]o send (a person) to prison or to a mental health facility, esp. by court order"[22]; the word "commitment"—the "act of confining a person in a prison, mental hospital, or other institution"[23]; and

---

[20] Brief for appellant at 17.

[21] *State v. Dixon*, 286 Neb. 334, 350, 837 N.W.2d 496, 508 (2013).

[22] Black's Law Dictionary 340 (11th ed. 2019).

[23] *Id.*

the word "term"—a "fixed period of time; esp., the period for which an estate is granted."[24] Accordingly, Drake understands these words as used in § 29-2221 to mean that the State is required to prove that Drake "was sent to prison for a fixed period of time of not less than one year *and that at least one year was served in prison*" by Drake.[25]

Because the State failed to show that Drake actually served at least 1 year on each of those sentences and the trial court accordingly made no such finding, Drake asserts that this court must vacate the district court's determination that Drake was a habitual criminal, vacate the sentence it imposed, and remand the matter for resentencing without a habitual criminal enhancement. Drake cites no other authority for his reading of the statute, and we are not aware of any such authority.

[9] Hence, we disagree with Drake's interpretation of § 29-2221 and observe that the term "commitment," as defined by Black's Law Dictionary, has multiple meanings. Another definition for "commitment" is the "order directing an officer to take a person to a penal . . . institution."[26] It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.[27] This alternative definition is consistent with the plain language of § 29-2221, and thus, we will apply it here.

Pursuant to our reading of § 29-2221, for purposes of the words "committed to prison," the State needs to show only that the defendant has twice been ordered by the court to be committed for at least 1 year to a penal institution. The State is not required to produce evidence that Drake actually served a full year in prison.

---

[24] *Id.* at 1773.

[25] Brief for appellant at 17.

[26] Black's Law Dictionary at 340.

[27] *Hauptman, O'Brien v. Auto-Owners Ins. Co.*, 310 Neb. 147, 964 N.W.2d 264 (2021).

As evidence of prior convictions, the State presented exhibits 4 and 5. Exhibit 4 contains a journal entry from November 1, 1989, which states that Drake was "sentenced to the Department of Correction[s] on Count I, theft, a Class III felony, for a term of 1-3 years with credit for 30 days served." Drake was also sentenced on a second conviction, to run concurrently. Exhibit 5 contains a judgment and sentence from June 29, 2004, which states that Drake "shall be incarcerated in an institution under the jurisdiction of the Nebraska Department of Correctional Services for a period of not less than fifteen (15) months and not more than thirty-six (36) months."

The language within both orders shows that the sentencing courts in those prior convictions ordered Drake to be taken to a penal institution within the control of the Nebraska Department of Correctional Services for a period of not less than 1 year on both November 1, 1989, and June 29, 2004. In other words, these exhibits together show that Drake has twice been committed to prison for not less than 1 year.

Based on a plain language reading of § 29-2221, the evidence presented by the State as proof of Drake's prior convictions was sufficient for purposes of habitual criminal enhancement. Accordingly, the district court did not err in finding Drake to be a habitual criminal.

3. Ineffective Assistance of Trial Counsel

In his third through seventh assignments of error, Drake asserts that he received ineffective assistance of trial counsel. Drake argues that trial counsel failed to schedule a timely motion to suppress, to request discovery, and to subpoena witnesses for the presentation of exhibits at trial; that trial counsel was ineffective when he agreed to a stipulated bench trial; and that trial counsel generally lacked the training and experience needed to act as a public defender.

[10] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the

record; otherwise, the ineffective assistance of trial counsel issue will be procedurally barred.[28]

[11] Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims.[29] The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[30] Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.[31]

[12,13] The necessary specificity of allegations of ineffective assistance of trial counsel on direct appeal for purposes of avoiding waiver requires, at a minimum, allegations of deficient performance described with enough particularity for an appellate court to make a determination of whether the claim can be decided upon the trial record and also for a district court later reviewing a potential petition for postconviction relief to be able to recognize whether the claim was brought before an appellate court.[32] Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.[33]

### (a) Failure to Timely Schedule Motion to Suppress

Drake first claims that trial counsel provided ineffective assistance by failing to schedule a timely hearing for

---

[28] *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

[29] *Id.*

[30] *State v. Lowman, supra* note 2.

[31] *State v. Abdullah, supra* note 28.

[32] *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). See *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019).

[33] *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

Drake's motion to suppress. Assuming, without deciding, that trial counsel's performance was deficient, we find that Drake cannot establish prejudice. The district court found that trial counsel had established good cause for filing the motion past the 10-day deadline, and the motion to suppress was thereafter set for a hearing and considered on the merits by the court.

Drake asserts that prejudice arose when the jury trial was scheduled to begin immediately after the motion to suppress hearing, as this "did not leave any room for any potential negotiation with the State . . . depending on the outcome of the Motion to Suppress."[34] Drake contends that if counsel had filed a timely hearing, and if the motion to suppress had been denied, Drake would have had more opportunity either to better prepare for trial or to work with the prosecutor toward a plea deal such that the proceedings at the trial level would have gone differently.

However, the record indicates that Drake was already in receipt of a plea offer from the State and chose to proceed with trial instead. Even if his motion had been timely filed, a lack of success at the suppression hearing does not suggest new leverage by which Drake would be able to secure a different or better deal from the State than was already offered. And the State would have little incentive to agree to any offer if it knew that Drake was unsuccessful in his motion, regardless of whether the trial proceeded immediately after the suppression hearing or days later. Accordingly, this assertion is without merit.

### (b) Failure to Request Discovery Information

Drake also assigns that trial counsel was ineffective in failing to request discovery prior to trial in the form of footage from the dashboard camera of Goplin's cruiser or of Goplin's body camera.

The record on appeal indicates that such performance was not deficient. Goplin testified that there was a dashboard

---

[34] Brief for appellant at 21.

camera on his cruiser, but that there was no footage available because that camera had malfunctioned. Goplin also testified that he was not wearing a body camera that night. In addition, there was a discovery stipulation in place well before trial wherein the parties agreed to provide discovery and reciprocal discovery prior to trial and wherein the State additionally acknowledged its duty to disclose certain evidence.

Trial counsel was not deficient for failing to make a specific request for discovery that did not exist, and therefore, Drake's allegation of ineffective assistance of counsel is without merit.

#### (c) Failure to Subpoena Witnesses Necessary to Provide Foundation for Exhibits

Drake next asserts that trial counsel's performance was deficient when he failed to subpoena witnesses who could offer foundation for the presentation of additional exhibits. Specifically, Drake argues that trial counsel made multiple attempts to enter exhibits 1 and 2 into evidence without first calling foundational witnesses, resulting in the exclusion of both exhibits from evidence.

However, the evidence included in exhibits 1 and 2 is cumulative of other admissible testimony and evidence. These exhibits included an incident narrative written by Goplin regarding the events that took place on December 28, 2018, and a York County sheriff's office incident log. The incident narrative reflects the testimony given by Goplin at the suppression hearing, as does the incident log. Drake has failed to establish that counsel was ineffective. Accordingly, his argument is without merit.

#### (d) Stipulated Bench Trial

Drake also assigns that his trial counsel performed deficiently by agreeing to a stipulated bench trial. Drake contends that his trial counsel, by stipulating to the facts as set forth

in exhibit 3, stipulated that 5 grams of methamphetamine were found on Drake's person, as well as some paraphernalia; that said items were consistent with the distribution of controlled substances; and that the suspected methamphetamine was tested in a laboratory and confirmed to be methamphetamine. Drake argues that these stipulated facts were guaranteed to secure a conviction against him and would support a habitual criminal enhancement of any sentence imposed.

However, the facts as stipulated for purposes of the bench trial merely reflect the evidence already presented at the motion to suppress hearing, as well as the prior findings by the district court when it denied Drake's motion to suppress. The facts within exhibit 3 did not stipulate to Drake's express knowledge or intent, key elements necessary to obtain a conviction under Neb. Rev. Stat. § 28-416 (Cum. Supp. 2020), regardless of the facts. Contrary to Drake's assertions, these stipulated facts did not "guarantee[]" his conviction,[35] but, rather, they allowed the parties to proceed after the suppression hearing had concluded without a need to resubmit evidence or testimony which either party had already presented to the court. Consequently, Drake's counsel did not act deficiently.

Further, the stipulation of facts included a statement that the contraband found in Drake's vehicle was "consistent with a 'small-time' or 'local' drug dealer, used in the distribution of controlled substances." Despite this stipulation, and despite the amended information charging Drake at count I with possession of a controlled substance with intent to distribute, the district court found Drake guilty of only count II, possession of a controlled substance. That the district court found Drake not guilty of count I is evidence that even if Drake's counsel had acted deficiently, Drake will not be able to prove that such performance prejudiced Drake. This claim of ineffective assistance of trial counsel is without merit.

---

[35] *Id.* at 24.

#### (e) Lack of Training and Experience

Finally, Drake asserts that he received ineffective assistance of counsel because his trial counsel lacked proper training and experience for purposes of acting as a public defender.

Drake reasserts, broadly, the above-described errors and claims that the culmination of these errors indicates that his trial counsel did not perform as well as a lawyer with ordinary training and skill in the area of criminal law. In addition, Drake more specifically argues that Drake's own comments at trial and sentencing prove a lack of proper counseling and advice from trial counsel. Drake claims that he was not adequately informed of the consequences of the habitual criminal sentencing and that trial counsel was not fully aware of the consequences of habitual criminal sentencing himself, asking the court whether it was going to sentence Drake "on the other charge." Drake contends that counsel's lack of understanding here prejudiced Drake because Drake did not understand the nature of what he was agreeing to when he turned down the plea deal offered by the State and continued to trial.

Here, Drake has not sufficiently alleged deficient performance. A generalized complaint regarding a lack of proper experience, skills, or training might be the standard by which this court will review the performance of counsel to determine whether their performance was deficient, but it is not specific enough, especially as stated here, to be a stand-alone claim.

Drake does not explain his basis for moving forward with trial, nor does he provide insight into how counsel's advice or explanation of the risks or consequences of proceeding to trial were either incorrect or deficient. Instead, Drake claims that counsel "could not have adequately advised" Drake of the consequences because counsel "was out of his depth."[36] We conclude that Drake has failed to allege this claim of deficient performance with sufficient particularity. A claim of

---

[36] *Id.* at 27.

ineffective assistance that is insufficiently stated is no different than a claim not stated at all.[37]

## VI. CONCLUSION

We affirm the decision of the district court, which denied Drake's motion to suppress and found him to be a habitual criminal for purposes of sentencing.

We find that Drake's claims of ineffective assistance of trial counsel are either without merit or not alleged with sufficient particularity.

Affirmed.

---

[37] *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019).