Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/23/2022 08:05 AM CST

State of Nebraska, appellee, v.
Seidy N. Albarenga, appellant.
___ N.W.2d ___

Filed December 23, 2022.    No. S-21-213.

1. **Ordinances: Appeal and Error.** Interpretation of a municipal ordinance is a question of law, on which an appellate court reaches an independent conclusion irrespective of the determination made by the court below.

2. **Statutes: Appeal and Error.** The interpretation of statutes and regulations presents questions of law which an appellate court reviews de novo.

3. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

4. **Statutes: Ordinances.** State preemption arises with respect to municipal ordinances or township laws and flows from the principle that municipal legislation is invalid if it is repugnant to, or inconsistent with, state law.

5. ____: ____. Preemption of municipal ordinances by state law is based on the fundamental principle that municipal ordinances are inferior in status and subordinate to the laws of the state.

6. **Constitutional Law: Municipal Corporations: Statutes: Ordinances.** Where a municipality has constitutionally conferred powers to form a charter and enact ordinances, the state law is the superior law only as to matters of statewide concern.

7. **Highways.** Highway control, which includes traffic control of city streets, is a preeminently state affair that affects the whole state.

8. **Highways: Legislature.** Traffic control of city streets is a legislative function in the exercise of its inherent police power to provide the means and methods of alleviating, in the public interest, traffic congestion throughout the state, particularly that which is designated as through traffic.

9. **Highways.** It is of statewide concern that traffic lanes through congested areas be kept open and that such areas be not permitted to operate as a bottleneck in the free movement of traffic, and this transcends any purely local concern.

10. **Statutes.** There are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption.

11. **Statutes: Legislature: Intent.** The touchstone of preemption analysis is legislative intent.

12. **Statutes: Legislature: Ordinances.** Neb. Rev. Stat. § 60-6,108(3) (Reissue 2021) expressly preempts local laws to the extent those laws are directly contrary to the Nebraska Rules of the Road, unless expressly authorized by the Legislature.

13. **Highways.** A steady red indication under Neb. Rev. Stat. § 60-6,123(3)(c) (Reissue 2021) includes lighted arrows.

14. **Statutes: Legislature: Intent.** In discerning the meaning of a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being a court's duty to discover, if possible, the Legislature's intent from the language of the statute itself.

15. **Statutes.** A court must give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.

16. ____. A statute is ambiguous when the language used cannot be adequately understood either from the plain meaning of the statute or when considered in pari materia with any related statutes.

17. ____. The in pari materia doctrine is an intrinsic aid whereby a court regards all statutes upon the same general subject matter as part of one system, and later statutes as supplementary or complementary to those preceding them.

18. **Statutes: Legislature: Intent.** Absent an express intent to incorporate another legislative body's law, the in pari materia doctrine does not apply as between laws enacted by different legislative bodies at different times.

19. **Administrative Law: Statutes: Legislature.** The Legislature can delegate to an administrative agency the power to make rules and regulations to implement the policy of a statute, but the administrative agency

is limited in its rulemaking authority to the powers delegated to it by the statute which it is to administer.

20. **Administrative Law: Statutes.** In order to be valid, a rule or regulation must be consistent with the statute under which the rule or regulation is promulgated.

21. \_\_\_\_: \_\_\_\_. An administrative agency may not employ its rulemaking power to modify, alter, or enlarge portions of its enabling statute.

22. **Administrative Law: Statutes: Appeal and Error.** While appellate courts have traditionally given considerable weight to a department's construction of an ambiguous statute it is charged with enforcing, resort to contemporaneous construction of a statute by administrative bodies is neither necessary nor proper where the language used is clear, or its meaning can be ascertained by the use of intrinsic aids alone.

23. **Highways: Words and Phrases.** For purposes of Neb. Rev. Stat. § 60-6,123(3)(c) (Reissue 2021), the term "traffic control device" is defined by § 60-123 and is a physical object; a traffic control device does not refer to an ordinance or the meaning attributed to that object vis-a-vis a local ordinance.

24. **Search and Seizure: Evidence.** The exclusionary rule is not found in the federal or state Constitution, but is a prudential doctrine to be employed where the deterrence benefits of suppression outweigh its costs.

25. **Police Officers and Sheriffs: Probable Cause.** Police officers are not required to be legal scholars, but implicit in the probable cause standard is the requirement that a police officer's mistakes be reasonable.

26. **Police Officers and Sheriffs: Presumptions.** Law enforcement is charged with enforcing laws, which are presumptively valid unless and until they are declared invalid.

Petition for further review from the Court of Appeals, Pirtle, Chief Judge, and Moore and Welch, Judges, on appeal thereto from the District Court for Lancaster County, Andrew R. Jacobsen, Judge. Judgment of Court of Appeals affirmed in part, and in part reversed and remanded with directions.

Joe Nigro, Lancaster County Public Defender, and Nathan Sohriakoff for appellant.

Christine A. Loseke, Assistant Lincoln City Prosecutor, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## INTRODUCTION

We granted further review of a Nebraska Court of Appeals' decision affirming the defendant's convictions for violating a municipal traffic signal law and for driving under the influence (DUI). The issues presented are (1) whether Neb. Rev. Stat. § 60-6,123(3)(c) (Reissue 2021) preempts a city ordinance providing that vehicular traffic facing a steady red arrow at the intersection of two one-way streets is prohibited from turning left at any time while the arrow remains red and (2) whether the evidence derived from the stop should have been excluded because the officer could not reasonably rely on a preempted traffic ordinance in making the stop. We reverse the traffic ordinance conviction but affirm the DUI conviction.

## BACKGROUND

Following a stipulated trial, Seidy N. Albarenga was found guilty in county court of DUI, first offense, and of violating an automatic traffic signal, both in violation of municipal ordinances of the city of Lincoln, Nebraska. She was sentenced accordingly.

### Traffic Stop

Albarenga's convictions stem from a traffic stop that took place in Lincoln on June 28, 2019. A law enforcement officer observed Albarenga on 17th Street, facing north, in the westernmost lane at the intersection with Q Street. Both 17th and Q Streets are one way, with Q Street running west.

The westernmost lane of 17th Street faced a traffic signal that displayed green, yellow, and red arrow lights. The only sign accompanying the signal was one directing traffic to turn left only. A similar arrow signal in at least one other intersection in Lincoln is accompanied by a separate sign indicating there is no turn on a red arrow.

Albarenga came to a complete stop at the intersection. The traffic control device displayed a red arrow light. After stopping, and while the red arrow was still lit, Albarenga turned left onto Q Street.

The law enforcement officer initiated a traffic stop on the grounds that Albarenga "violated the left turn arrow." During the stop, the officer observed signs that Albarenga was impaired. A chemical test showed a reading of 0.142 of a gram of alcohol per 210 liters of breath.

## Charges

Albarenga was charged with two counts in county court. Count 1 charged her with DUI, first offense, in violation of Lincoln Mun. Code § 10.16.030 (2017). Count 2 charged her with violating an automatic traffic signal, in violation of Lincoln Mun. Code § 10.12.030 (2017). Section 10.12.030 prohibits turning at a steady red arrow indication and requires the driver to remain stopped until a green light is displayed. It states:

> Whenever traffic is controlled by an automatic traffic signal or other official traffic control device exhibiting different colored lights or colored, lighted arrows successively, one at a time or in combination, only the colors green, red, and yellow shall be used, except for pedestrian signals, and said lights shall indicate and apply to drivers of vehicles and pedestrians as follows:
>
> . . . .
>
> RED ARROW: Vehicular traffic facing a lighted steady red arrow shall stop before entering the crosswalk on the near side of the intersection and remain stopped until a green light is displayed, except as otherwise permitted in this title.

## Pretrial Motions

Albarenga moved to quash count 2 and moved to suppress the evidence derived from the stop, which the State intended to offer to prove the charges in count 1. Both motions revolved

around Albarenga's argument that what § 10.12.030 directs a steady red arrow light shall signal to drivers in Lincoln is in direct conflict with what § 60-6,123(3)(c) directs a steady red arrow light shall signal to drivers throughout the State of Nebraska. She argued that § 60-6,123 requires any "steady red indication," which specifically includes "different colored lights or colored lighted arrows," "shall indicate" to drivers at an intersection of two one-way streets that they "may cautiously enter the intersection to make a left turn after stopping." Thus, Albarenga argued that § 10.12.030 prohibits what § 60-6,123 expressly permits and that § 10.12.030 is thereby preempted by state law.

Section 60-6,123 is part of the Nebraska Rules of the Road (Rules of the Road).[1] Describing traffic signals, § 60-6,123 provides in relevant part:

Whenever traffic is controlled by traffic control signals exhibiting different colored lights or colored lighted arrows, successively one at a time or in combination, only the colors green, red, and yellow shall be used, except for special pedestrian signals carrying a word legend, number, or symbol, and such lights shall indicate and apply to drivers of vehicles and pedestrians as follows:

(1)(a) Vehicular traffic facing a circular green indication may proceed straight through or turn right or left unless a sign at such place prohibits either such turn, but vehicular traffic, including vehicles turning right or left, shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time such indication is exhibited;

(b) Vehicular traffic facing a green arrow indication, shown alone or in combination with another indication, may cautiously enter the intersection only to make the movement indicated by such arrow or such other

---

[1] See Neb. Rev. Stat. §§ 60-601 to 60-6,383 (Reissue 2021 & Cum. Supp. 2022).

movement as is permitted by other indications shown at the same time, and such vehicular traffic shall yield the right-of-way to pedestrians lawfully within an adjacent crosswalk and to other traffic lawfully using the intersection; and

(c) Unless otherwise directed by a pedestrian-control signal, pedestrians facing any green indication, except when the sole green indication is a turn arrow, may proceed across the roadway within any marked or unmarked crosswalk;

(2)(a) Vehicular traffic facing a steady yellow indication is thereby warned that the related green movement is being terminated or that a red indication will be exhibited immediately thereafter when vehicular traffic shall not enter the intersection, and upon display of a steady yellow indication, vehicular traffic shall stop before entering the nearest crosswalk at the intersection, but if such stop cannot be made in safety, a vehicle may be driven cautiously through the intersection; and

(b) Pedestrians facing a steady yellow indication, unless otherwise directed by a pedestrian-control signal, are thereby advised that there is insufficient time to cross the roadway before a red indication is shown and no pedestrian shall then start to cross the roadway;

(3)(a) Vehicular traffic facing a steady red indication alone shall stop at a clearly marked stop line or shall stop, if there is no such line, before entering the crosswalk on the near side of the intersection or, if there is no crosswalk, before entering the intersection. The traffic shall remain standing until an indication to proceed is shown except as provided in subdivisions (3)(b) and (3)(c) of this section;

(b) Except where a traffic control device is in place prohibiting a turn, vehicular traffic facing a steady red indication may cautiously enter the intersection to make a right turn after stopping as required by subdivision (3)(a)

of this section. Such vehicular traffic shall yield the right-of-way to pedestrians lawfully within an adjacent cross-walk and to other traffic lawfully using the intersection;

(c) Except where a traffic control device is in place prohibiting a turn, vehicular traffic facing a steady red indication at the intersection of two one-way streets may cautiously enter the intersection to make a left turn after stopping as required by subdivision (3)(a) of this section. Such vehicular traffic shall yield the right-of-way to pedestrians lawfully within an adjacent crosswalk and to other traffic lawfully using the intersection; and

(d) Unless otherwise directed by a pedestrian-control signal, pedestrians facing a steady red indication alone shall not enter the roadway.

The county court ruled that § 10.12.030 was not preempted by state law and overruled Albarenga's pretrial motions.

## Appeal to District Court

Albarenga appealed to the district court, assigning as error the county court's rulings on her pretrial motions. The district court affirmed her convictions. The district court agreed with the county court that § 10.12.030 did not conflict with the Rules of the Road.

## Court of Appeals

Albarenga thereafter appealed to the Court of Appeals, asserting that the district court erred in affirming the county court's rulings denying her motions to quash and to suppress. Albarenga assigned that the district court erred by affirming the county court's (1) finding that § 10.12.030 is not in conflict with § 60-6,123, (2) denial of Albarenga's motion to suppress, and (3) denial of Albarenga's motion to quash count 2. The Court of Appeals also affirmed the convictions.[2]

The Court of Appeals found merit to Albarenga's reading of § 60-6,123 in isolation, noting that § 60-6,123, by referring

---

[2] See *State v. Albarenga*, 30 Neb. App. 711, 972 N.W.2d 85 (2022).

in its introductory clause to "both 'colored lights' and 'colored lighted arrows'" as encompassed therein, demonstrated an awareness of both circular and arrow indications.[3] Observing that what a statute does not say is as important as what it does, the Court of Appeals concluded that by setting forth in other subsections separate rules for "'a circular green indication'" versus "'a green arrow indication,'" while giving only one rule for "'a steady red indication,'" without distinguishing between a circle and an arrow, § 60-6,123 refers by the term "steady red indication" in § 60-6,123(3)(c) to both a red arrow and a red circle.[4]

Nevertheless, the Court of Appeals concluded § 60-6,123 should be read in pari materia with the Manual on Uniform Traffic Control Devices (Manual), which was adopted pursuant to § 60-6,118, and of which the Court of Appeals took judicial notice.[5] Under the Manual, a steady red arrow signal prohibits entering the intersection unless a traffic control device is in place permitting a turn on a steady red arrow. The Court of Appeals observed that "§ 4D.04, ¶ 3, items C.1 & C.2," of the Manual provided as follows:

"C. Steady red signal indications shall have the following meanings:

"1. Vehicular traffic facing a steady CIRCULAR RED signal indication, unless entering the intersection to make another movement permitted by another signal indication, shall stop . . . and shall remain stopped until a signal indication to proceed is displayed, or as provided below.

"Except when a traffic control device is in place prohibiting a turn on red or a steady RED ARROW signal indication is displayed, vehicular traffic facing a steady CIRCULAR RED signal indication is permitted to enter

---

[3] See *id.*, 30 Neb. App. at 718, 972 N.W.2d at 91.

[4] See *id.*

[5] See *State v. Albarenga, supra* note 2.

the intersection to turn right, or to turn left from a one-way street into a one-way street, after stopping. . . .

"2. Vehicular traffic facing a steady RED ARROW signal indication shall not enter the intersection to make the movement indicated by the arrow and, unless entering the intersection to make another movement permitted by another signal indication, shall stop . . . and shall remain stopped until a signal indication or other traffic control device permitting the movement indicated by such RED ARROW is displayed.

"When a traffic control device is in place permitting a turn on a steady RED ARROW indication, vehicular traffic facing a steady RED ARROW signal indication is permitted to enter the intersection to make the movement indicated by the arrow signal indication, after stopping."[6]

The Court of Appeals noted the Manual provided further, that "'[e]xcept as described in Item C.2 in Paragraph 3 of Section 4D.04, turning on a steady RED ARROW signal indication shall not be permitted.'"[7]

The Court of Appeals did not expressly analyze whether the provisions of the Manual it quoted were consistent with the provisions of the Rules of the Road and the mandate of the enabling statute, § 60-6,118, that the Department of Transportation may adopt and promulgate rules and regulations and implement a manual providing a uniform system of traffic control devices "[c]onsistent with the provisions of the . . . Rules of the Road." Nor did it discuss whether principles of in pari materia apply as between statutes and regulations. The Court of Appeals cited the proposition that agency regulations properly adopted and filed with the Secretary of State of Nebraska have the effect of statutory law and bind

---

[6] *State v. Albarenga, supra* note 2, 30 Neb. App. at 720-21, 972 N.W.2d at 92.

[7] *Id.* at 721, 972 N.W.2d at 92.

the agency that promulgated them just as they bind individual citizens.[8] It then reasoned that the Manual is more specific than § 60-6,123 concerning red arrow indications and therefore controlling.

We granted Albarenga's petition for further review.

## ASSIGNMENTS OF ERROR

In her brief in support of further review, Albarenga assigns that the Court of Appeals erred by (1) taking judicial notice of the Manual, (2) finding that the plain language of the Manual should be treated like a statute, (3) treating the Manual as the "'controlling law'" when it found that the statutory language of § 60-6,123 was "'less specific'" than the language of the Manual, (4) finding that § 10.12.030 is consistent with Nebraska law, and (5) finding that her second and third assignments of error were without merit "'because there is no conflict between § 10.12.030 and § 60-6,123.'"

## STANDARD OF REVIEW

[1] Interpretation of a municipal ordinance is a question of law, on which we reach an independent conclusion irrespective of the determination made by the court below.[9]

[2] The interpretation of statutes and regulations presents questions of law which we review de novo.[10]

[3] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[11] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of

---

[8] See *State v. Albarenga, supra* note 2, citing *Melanie M. v. Winterer*, 290 Neb. 764, 862 N.W.2d 76 (2015).

[9] *Wilkison v. City of Arapahoe*, 302 Neb. 968, 926 N.W.2d 441 (2019).

[10] *Id*.

[11] *State v. Saitta*, 306 Neb. 499, 945 N.W.2d 888 (2020).

law that an appellate court reviews independently of the trial court's determination.[12]

## ANALYSIS

Albarenga asserts on appeal, as she did below, that § 10.12.030 is in conflict with § 60-6,123(3)(c) and thereby preempted by state law. She asserts that because § 10.12.030 is preempted, the county court erred in denying her motion to quash the charge against her in count 2 for violating § 10.12.030 and the Court of Appeals erred in affirming her conviction of violating that ordinance. Albarenga argues it also follows from the preemption of § 10.12.030 that the stop for violating § 10.12.030 was not objectively reasonable and that the district court should have granted her motion to suppress the evidence derived from the stop.

The State does not agree that § 10.12.030 is preempted by § 60-6,123(3)(c), but argues that, even if it is, the arresting officer reasonably relied on the ordinance when stopping Albarenga for a traffic violation. The State accordingly argues that the district court did not err in overruling Albarenga's motion to suppress and that the DUI conviction, at the very least, should be affirmed.

We agree with Albarenga that § 10.12.030 is preempted by state law. We also agree with the State that the arresting officer reasonably relied on the ordinance when making the stop.

### Preemption

[4-6] State preemption arises with respect to municipal ordinances or township laws and flows from the principle that municipal legislation is invalid if it is repugnant to, or inconsistent with, state law.[13] Preemption of municipal ordinances by state law is based on the fundamental principle that

---

[12] *Id.*

[13] See 5 Eugene McQuillin, The Law of Municipal Corporations § 15:19 (3d ed. 2022).

municipal ordinances are inferior in status and subordinate to the laws of the state.[14] That said, where a municipality such as Lincoln has constitutionally conferred powers to form a charter and enact ordinances, the state law is the superior law only as to matters of statewide concern.[15]

[7-9] Highway control, which includes traffic control of city streets, is a preeminently state affair that affects the whole state.[16] We have explained that traffic control of city streets is a legislative function in the exercise of its inherent police power to provide the means and methods of alleviating, in the public interest, traffic congestion throughout the state, "particularly that which is designated as through traffic."[17] "It is of state-wide concern that traffic lanes through congested areas be kept open and that such areas be not permitted to operate as a bottleneck in the free movement of traffic," and this "transcends any purely local concern."[18]

[10,11] There are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption,[19] although it has been commented in the federal preemption context that the three categories "are anything but analytically air-tight."[20] In all three cases, the touchstone of preemption analysis is legislative intent.[21]

---

[14] *Malone v. City of Omaha*, 294 Neb. 516, 883 N.W.2d 320 (2016).

[15] See, Neb. Rev. Stat. § 15-263 (Reissue 2022); Neb. Const. art. XI, §§ 2 and 5.

[16] See *Omaha Parking Authority v. City of Omaha*, 163 Neb. 97, 77 N.W.2d 862 (1956).

[17] *Id.* at 105, 77 N.W.2d at 869.

[18] *Id.* See, also, *Herman v. Lee*, 210 Neb. 563, 316 N.W.2d 56 (1982).

[19] *Hauptman, O'Brien v. Auto-Owners Ins. Co.*, 310 Neb. 147, 964 N.W.2d 264 (2021).

[20] *R.F. v. Abbott Laboratories*, 162 N.J. 596, 618, 745 A.2d 1174, 1187 (2000) (quoting Laurence H. Tribe, American Constitutional Law § 6-28 (3d ed. 2000)).

[21] *Hauptman, O'Brien v. Auto-Owners Ins. Co., supra* note 19.

One of the express purposes of the Rules of the Road, set forth in § 60-602(7), is "[t]o assist traffic law enforcement by encouraging voluntary compliance with law through uniform rules." Accordingly, § 60-604 sets forth rules of construction of the Rules of the Road that they "shall be so interpreted and construed as to effectuate their general purpose to make uniform the laws relating to motor vehicles." Section 60-680 authorizes local authorities within the reasonable exercise of their police power to "regulate" traffic by means of traffic control devices and "[r]egulate or prohibit" stopping and the turning of vehicles, but this provision does not authorize, in the course of so doing, the adoption of ordinances in direct conflict with the Rules of the Road.

[12] Section 60-6,108(3) explicitly mandates that no local authority shall enact or enforce any ordinance directly contrary to the Rules of the Road:

> The Nebraska Rules of the Road shall be applicable and uniform throughout this state and in all political subdivisions and municipalities of this state, and no local authority shall enact or enforce any ordinance directly contrary to the Nebraska Rules of the Road unless expressly authorized by the Legislature.

We explained in *Butler County Dairy v. Butler County*[22] that in expressly preempting local laws, the Legislature includes provisions explicitly stating in some manner that (1) the legislation preempts local laws related to the subject matter of the legislation, (2) a certain subject is governed solely by the legislation, or (3) political subdivisions are prohibited from enacting any local law conflicting with the legislation. Section 60-6,108(3) explicitly preempts local laws to the extent those law are directly contrary to the Rules of Road, unless expressly authorized by the Legislature.

[13] Section 60-6,123 of the Rules of the Road plainly provides: "Except where a traffic control device is in place

---

[22] See *Butler County Dairy v. Butler County*, 285 Neb. 408, 827 N.W.2d 267 (2013).

prohibiting a turn," a steady red arrow signal "shall indicate . . . to drivers" they are permitted to "cautiously enter the intersection to make a left turn after stopping." While § 60-6,123(3)(c) does not expressly refer to the shape of the signal, subsection (3)(c) refers broadly to a "steady red indication" and, under the introductory clause of § 60-6,123, provides that "[w]henever traffic is controlled by traffic control signals exhibiting different colored lights or colored lighted arrows," "such lights shall indicate and apply to drivers of vehicles and pedestrians" as described by its subsections. In other words, reading § 60-6,123(3)(c) in light of all parts of the statute, a "steady red indication" includes "lighted arrows." We cannot read out of "steady red indication" the general inclusion of arrows in the "traffic control signal" the statute is meant to describe.

Thus, it is not a fair reading of the "steady red indication" referenced in § 60-6,123(3)(c) that it includes circular lights but excludes arrow lights. And we note that throughout § 60-6,123, the Legislature utilized the terms "circular green indication," "green arrow indication," "steady yellow indication," "red indication," and "steady red indication," while nowhere differentiating between a "steady red indication" that is circular and one that is an arrow. The Legislature expressly differentiated between green circles and arrows, but not for red indications. We cannot read into the statute a distinction between arrows and circles that deliberately is not there.

[14-16] In discerning the meaning of a statute, we must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being our duty to discover, if possible, the Legislature's intent from the language of the statute itself.[23] A court must give effect to all parts of a statute, and if it can be avoided,

---

[23] *Vokal v. Nebraska Acct. & Disclosure Comm.*, 276 Neb. 988, 759 N.W.2d 75 (2009).

no word, clause, or sentence will be rejected as superfluous or meaningless.[24] A statute is ambiguous when the language used cannot be adequately understood either from the plain meaning of the statute or when considered in pari materia with any related statutes.[25]

Giving effect to all words and parts of § 60-6,123, it is not ambiguous. It plainly provides that the "steady red indication," a subset of "traffic control signals exhibiting different colored light or colored lighted arrows," encompasses "colored lighted arrows." Such "traffic control signals" "shall . . . apply to drivers of vehicles" in this state so as to indicate at the intersection of two one-way streets that they "may cautiously enter the intersection to make a left turn after stopping."

[17,18] The Manual cannot be utilized in pari materia with § 60-6,123 to create ambiguity in the statute where there is none. Contrary to what the Court of Appeals suggested in its opinion, rules and regulations are not at the same level with statutes for the purpose of an in pari materia reading of a statutory scheme. The in pari materia doctrine is an intrinsic aid whereby we "regard all statutes upon the same general subject matter as part of one system, and later statutes . . . as supplementary or complementary to those preceding them."[26] We look to that which has been enacted by the same legislative body to discern that body's uniform design, presuming the legislative body is conscious of its own prior enactments.[27] We have applied this in pari materia

---

[24] *In re William R. Zutavern Revocable Trust*, 309 Neb. 542, 961 N.W.2d 807 (2021).

[25] *Johnson v. Kenney*, 265 Neb. 47, 654 N.W.2d 191 (2002). See, also, generally, *Erlenbaugh v. United States*, 409 U.S. 239, 93 S. Ct. 477, 34 L. Ed. 2d 446 (1972).

[26] *State v. Omaha Elevator Co.*, 75 Neb. 637, 648, 106 N.W. 979, 983-84 (1906).

[27] See *id*.

doctrine as between statutes, as between regulations,[28] and as between ordinances,[29] but we have not applied in pari materia principles vertically between these differing legislative bodies. The U.S. Supreme Court has explained that the in pari materia doctrine's application makes the most sense when the statutes were enacted by the same legislative body at the same time, but it can also apply to laws enacted by the same legislative body at different times, albeit with lesser force.[30] Absent an express intent to incorporate another legislative body's law,[31] the in pari materia doctrine does not apply as between laws enacted by different legislative bodies at different times.

[19-22] The Legislature can delegate to an administrative agency the power to make rules and regulations to implement the policy of a statute,[32] but the administrative agency is limited in its rulemaking authority to the powers delegated to it by the statute which it is to administer.[33] In order to be valid, a rule or regulation must be consistent with the statute under which the rule or regulation is promulgated.[34] An administrative agency may not employ its rulemaking power to modify, alter, or enlarge portions of its enabling statute.[35] While we have traditionally given considerable weight to a department's construction of an ambiguous statute it is charged

---

[28] See, e.g., *Hochstein v. Cedar Cty. Bd. of Adjustment*, 305 Neb. 321, 940 N.W.2d 251 (2020).

[29] See, e.g., *id*.

[30] See *Erlenbaugh v. United States, supra* note 25.

[31] See Charles S. Dameron*, Present at Antitrust's Creation: Consumer Welfare in the Sherman Act's State Statutory Forerunners*, 125 Yale L.J. 1072 (2016).

[32] *Wagoner v. Central Platte Nat. Resources Dist.*, 247 Neb. 233, 526 N.W.2d 422 (1995).

[33] *State ex rel. Spire v. Stodola*, 228 Neb. 107, 421 N.W.2d 436 (1988).

[34] *Robbins v. Neth*, 273 Neb. 115, 728 N.W.2d 109 (2007).

[35] See *State ex rel. Spire v. Stodola, supra* note 33.

with enforcing, resort to contemporaneous construction of a statute by administrative bodies is neither necessary nor proper where the language used is clear, or its meaning can be ascertained by the use of intrinsic aids alone.[36] Section 60-6,123 is not ambiguous. Therefore, the Manual has no bearing on our understanding of the statute.

The State argues that even if a "steady red indication" plainly encompasses red arrows and mandates, as a default, that a cautious turn after stopping is permitted at a steady red arrow signal, the Lincoln ordinance—or the steady red arrow, by virtue of the ordinance—is a "traffic control device . . . in place prohibiting a turn." Again, § 60-6,123(3)(c) provides: "Except where a traffic control device is in place prohibiting a turn, vehicular traffic facing a steady red indication at the intersection of two one-way streets may cautiously enter the intersection to make a left turn after stopping . . . ." We disagree with the State's understanding of a "traffic control device."

[23] The State overlooks that "traffic control device" is defined in § 60-670 as "any sign, signal, marking, or other device not inconsistent with the Nebraska Rules of the Road placed or erected by authority of a public body or official having jurisdiction for the purpose of regulating, warning, or guiding traffic." Section 10.12.030, as already discussed, is inconsistent with § 60-6,123(3)(c) of the Rules of the Road, and thus, it would not satisfy § 60-670 for that reason. Additionally, the reference in § 60-670 to the device being "placed or erected," along with the statutory reference in § 60-6,123(3)(c) to the "traffic control device" being "in place," and a similar reference in § 60-670 to a "[t]raffic control device" being "placed or erected," refers to a physical object rather than a meaning attributed to that object vis-a-vis a local ordinance.

A uniform meaning of a steady red arrow indication, as set forth by the Rules of the Road, is necessary for the State to achieve the objectives of encouraging the free movement of

---

[36] *Ameritas Life Ins. v. Balka*, 257 Neb. 878, 601 N.W.2d 508 (1999).

traffic. Nothing in the language of the statutory scheme, nor in logic, suggests that by providing an exception for a "traffic control device . . . prohibiting a turn," the Legislature wished to confer upon each municipality across this state the ability to establish by ordinance different meanings for the same steady red arrow indication explicitly defined by the Rules of the Road. Doing so would create confusion and impede traffic flow and would be directly contrary to the stated purpose in § 60-604 of "mak[ing] uniform the laws relating to motor vehicles."

By prohibiting a turn on a steady red arrow indication after stopping, § 10.12.030 runs directly counter to the provision of § 60-6,123(3)(c) that permits a turn on a steady red arrow indication after stopping. The ordinance attempts to forbid that which the Legislature has expressly authorized. Accordingly, § 10.12.030 is preempted by state law.

The Court of Appeals erred by failing to reverse the decisions of the lower courts with respect to the denial of Albarenga's motion to quash the charge in count 2. The ordinance Albarenga was charged with violating under that count is unenforceable because it is preempted by state law. We find it unnecessary to address Albarenga's assignment that the Court of Appeals erred in taking judicial notice of the Manual.

## Exclusionary Rule

It does not necessarily follow from our holding invalidating § 10.12.030 that the fruits of the stop supporting Albarenga's DUI conviction were inadmissible. Albarenga argues the Lincoln police officers have a duty to know the Rules of the Road and should have known the ordinance was preempted. While law enforcement officers have a duty to know the law, § 10.12.030 was the law at the time of the stop, and we find that a reasonable officer would not have anticipated our holding that § 10.12.030 is preempted by § 60-6,123(3)(c).

[24] The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures . . . ," as does article I, § 7, of the Nebraska Constitution.[37] The exclusionary rule is not found in the federal or state Constitution, but is a prudential doctrine to be employed where the deterrence benefits of suppression outweigh its costs.[38] When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.[39] On the other hand, when the police act with an objectively reasonable good faith belief that their conduct is lawful or when their conduct involves only simple, isolated negligence, the deterrent value is weak and tends not to outweigh the resulting costs.[40]

[25] As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.[41] In reviewing a challenge to the legality of an automobile stop, the question is not whether the police officer issued a citation for a traffic violation or whether the State ultimately proved the violation; instead, a stop of a vehicle is objectively reasonable when the police officer has probable cause to believe that a traffic violation has occurred.[42] Police officers are not required to be legal scholars,[43] but implicit in the probable cause standard is the requirement that a police officer's mistakes be reasonable.[44]

---

[37] *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018).

[38] See *Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011).

[39] *Id.*

[40] *Id.*

[41] *State v. Barbeau, supra* note 37.

[42] *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017).

[43] *State v. Thalken*, 299 Neb. 857, 911 N.W.2d 562 (2018).

[44] *State v. Matit*, 288 Neb. 163, 846 N.W.2d 232 (2014).

[26] Under most circumstances, it is unreasonable to expect an officer to question the validity of the law the officer is charged with enforcing.[45] Law enforcement is charged with enforcing laws, which are presumptively valid unless and until they are declared invalid.[46] With few possible exceptions, such as where a law is "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws," "[s]ociety would be ill-served" if its law enforcement officers took it upon themselves to determine which laws are and which are not entitled to enforcement.[47]

*People v. McNeil*[48] illustrates a criminal ordinance that was held not to be presumptively valid because well-established case law had declared as preempted by state law an ordinance substantively similar to the one under which the defendant had been arrested and searched incident to arrest.[49] The court held the precedent so undermined the continuing enforceability of the ordinance that it was not objectively reasonable for the officers to rely upon it.[50] In contrast, at the time of the stop of Albarenga for turning on a steady red arrow signal, there was no case law indicating § 10.12.030, or any similar ordinance, was preempted. The Court of Appeals' decision and the lower courts' conclusions in this case illustrate this fact.

It was objectively reasonable for the officer who stopped Albarenga to presume that § 10.12.030 was enforceable, and there is no dispute that the officer observed Albarenga's

---

[45] See, *Illinois v. Krull*, 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987); *Michigan v. DeFillippo*, 443 U.S. 31, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979).

[46] See *Michigan v. DeFillippo, supra* note 45.

[47] See *id.*, 443 U.S. at 38.

[48] *People v. McNeil*, 96 Cal. App. 4th 1302, 118 Cal. Rptr. 2d 54 (2002).

[49] See, also, *Carcamo v. Los Angeles County Sheriff's Dept.*, 68 Cal. App. 5th 608, 283 Cal. Rptr. 3d 647 (2021); *People v. Cox*, 168 Cal. App. 4th 702, 85 Cal. Rptr. 3d 716 (2008).

[50] *People v. McNeil, supra* note 48.

failing to comply with § 10.12.030. The county court did not err in denying Albarenga's motion to suppress, and the Court of Appeals, albeit on different grounds, did not err in so holding.

## CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals' decision with respect to Albarenga's conviction on count 2 for violating § 10.12.030 and remand the cause to the Court of Appeals with directions to reverse the judgment of the district court on count 2 and to direct the district court to remand the cause to the county court with directions to vacate the conviction on count 2 and to dismiss that charge of the complaint.

Affirmed in part, and in part reversed
and remanded with directions.