Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/22/2017 08:11 PM CST

State of Nebraska, appellee, v.
Jamos M. Jasa, appellant.
___ N.W.2d ___

Filed September 22, 2017.    No. S-16-989.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Administrative Law: Statutes: Appeal and Error.** The meaning and interpretation of statutes and regulations are questions of law which an appellate court resolves independently of the lower court's conclusion.

3. **Constitutional Law: Search and Seizure: Investigative Stops: Arrests: Probable Cause.** The Fourth Amendment guarantees the right to be free of unreasonable search and seizure. This guarantee requires that an arrest be based on probable cause and limits investigatory stops to those made upon an articulable suspicion of criminal activity.

4. **Criminal Law: Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** A traffic stop requires only that the stopping officer have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime.

5. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** If an officer has probable cause to stop a traffic violator, the stop is objectively reasonable.

6. ____: ____: ____: ____. A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle.

7. **Judgments: Appeal and Error.** Where the record adequately demonstrates that the decision of a trial court is correct—although such

correctness is based on a ground or reason different from that assigned by the trial court—an appellate court will affirm.

8. **Blood, Breath, and Urine Tests: Drunk Driving: Evidence: Proof.** The four foundational elements which the State must establish as a foundation for the admissibility of a breath test in a driving under the influence prosecution are as follows: (1) that the testing device was working properly at the time of the testing, (2) that the person administering the test was qualified and held a valid permit, (3) that the test was properly conducted under the methods stated by the Department of Health and Human Services, and (4) that all other statutes were satisfied.

9. **Statutes.** Statutory language is to be given its plain and ordinary meaning.

10. **Statutes: Legislature: Intent: Appeal and Error.** An appellate court will not look beyond a statute to determine the legislative intent when the words are plain, direct, or unambiguous.

11. **Appeal and Error.** In appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Affirmed.

Brad Roth, of McHenry, Haszard, Roth, Hupp, Burkholder & Blomenberg, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Kelch, J.

## INTRODUCTION

Following a jury trial, Jamos M. Jasa appeals his conviction and sentence for aggravated driving under the influence (DUI), third offense, a Class IIIA felony under Neb. Rev. Stat. §§ 60-6,196 (Reissue 2010) and 60-6,197.03(6) (Cum. Supp. 2014). Jasa challenges the order of the district court for Lancaster County that denied his motion to suppress the

results of a chemical breath test. We conclude that the district court did not err in finding that law enforcement (1) had reasonable suspicion to initiate a traffic stop, (2) administered a 15-minute observation period prior to the chemical breath test in accordance with title 177 of the Nebraska Administrative Code, and (3) complied with Neb. Rev. Stat. § 60-6,199 (Reissue 2010) by allowing access to a telephone to arrange independent testing. Therefore, we affirm.

## BACKGROUND

On February 14, 2015, Jasa was the subject of a traffic stop, which led to a DUI investigation and a chemical breath test showing an alcohol concentration of .191 grams of alcohol per 210 liters of Jasa's breath. The State charged Jasa pursuant to §§ 60-6,196 and 60-6,197.03(6) with DUI, third offense, while having a breath alcohol concentration of .15 grams of alcohol per 210 liters of breath, or more.

Prior to trial, Jasa moved to suppress his chemical breath test result on several grounds. In relevant part, he alleged (1) that law enforcement officers lacked reasonable suspicion or probable cause to stop his vehicle, making any evidence obtained as a result of the stop inadmissible; (2) that the chemical breath test was not conducted in compliance with title 177 of the Nebraska Administrative Code, because law enforcement officers failed to properly and continuously monitor him for 15 minutes prior to the breath test; and (3) that Jasa was prohibited from obtaining independent testing of his alcohol concentration, which rendered his breath test result inadmissible under § 60-6,199.

At the hearing on Jasa's motion to suppress, the evidence established that on February 14, 2015, shortly after midnight, Officers Kenneth Morrow and Jonathan Sears of the Lincoln Police Department were on patrol together when they received a dispatch about a vehicle that was "all over the road" at First and West O Streets in Lincoln, Nebraska. The dispatch center received the initial report from an employee

of Lincoln Fire and Rescue (LFR). The report originated from LFR "Engine 3," which is based at a firehouse near First and West O Streets.

Morrow and Sears arrived in the area within a few minutes. At approximately Third and West O Streets, they saw a pickup that matched the description and the license plate number provided by LFR.

Morrow testified that they observed the pickup weaving in its lane and saw both the front and rear driver's side tires completely cross over the dashed lane divider line. The district court received into evidence Lincoln Mun. Code § 10.14.110 (1990), which prohibits a motorist's vehicle from straddling the lane line with its wheels for a distance greater than required to safely change lanes.

Morrow testified that after seeing the pickup cross the lane line with its driver's side tires, he activated his cruiser camera, which was able to "jump back . . . 10 seconds on the video." A copy of the resulting video was received at the suppression hearing. Morrow testified that the video shows the pickup weaving within its lane and then crossing the lane line. Due to the quality of the video, lighting, and movement, the lane line is difficult to discern during portions of the video; however, it does appear that the pickup weaved in its lane and could have briefly crossed the lane line with both driver's side tires. Morrow acknowledged that the quality of the video was "not great," but stated that from his perspective, he was able to see the driver's side tires cross the lane line. After perceiving this traffic violation, the officers initiated a traffic stop and identified the pickup's driver as Jasa.

Morrow testified that Jasa's driving behaviors were consistent with someone who is under the influence of alcohol and that he administered field sobriety tests and a preliminary breath test at the scene of the traffic stop. Jasa was ultimately arrested for DUI.

While detained in the police cruiser, Jasa twice requested a blood test. Morrow testified that the officers could have taken

Jasa to a hospital for a chemical blood test. Instead, the officers transported Jasa to the Lancaster County jail for a chemical breath test. They arrived at the jail at 1:04 a.m.

While Sears prepared for the breath test, Morrow accompanied Jasa to a different room where Jasa changed into a jail uniform. Morrow observed Jasa for 15 minutes prior to the chemical breath test, monitoring him for belching, vomiting, or anything that would bring alcohol from his stomach to his mouth and affect the accuracy of the test. Morrow testified that he observed none of these behaviors.

Sears testified that he was aware that the 15-minute observation had taken place but that Morrow did not directly communicate with Sears about his observations. Sears explained that sometimes, when two officers conduct a DUI investigation, one officer carries out the observation period while the other administers the chemical test, but that normally, the subject sits beside the testing machine for the 15-minute observation period.

Morrow testified that he explained the chemical breath test process to Jasa, and Sears testified that he, Sears, completed the steps necessary to administer the test. At some point, Morrow filled out "Attachment 16," a "checklist technique . . . approved and prescribed" by title 177 of the Nebraska Administrative Code. The checklist requires the following tasks: verify the testing instrument's maintenance, "[o]bserve the subject for 15 minutes prior to testing," record the time the observation began, attach a clean mouthpiece, verify that a complete breath sample was obtained with no errors, and indicate the alcohol content of the breath sample obtained. The bottom of the form includes a line above the words "Permit Holder." Morrow checked the box next to each task on the form, filled in the necessary information, and identified Sears as the permit holder. Morrow testified that normally, the officer who administers the breath test is identified as the permit holder. Morrow and Sears both had Class B permits to operate the testing instrument.

Sears administered the chemical breath test at 1:22 a.m. Both Morrow and Sears were present. The test indicated that Jasa had a breath alcohol concentration of .191 grams of alcohol per 210 liters of breath.

Immediately after the chemical breath test, Morrow read Jasa a "physician's advisement," which informed Jasa that under § 60-6,199, he had a right to undergo independent testing but would have to procure and pay for it himself. Morrow further explained to Jasa that Jasa would have to ask someone to come to the jail to perform an independent test. Jasa asked how he could arrange such testing, and Morrow informed him that he would be allowed to use the telephone and would have to speak with the jail staff for further details. Additionally, Morrow told Jasa that he would have to remain in jail until his court date 3 days later.

Jasa was cited for aggravated DUI, third offense, a felony. Morrow testified that Jasa had to be lodged in jail because his offense was not bondable. Sears explained that the offense was not bondable because Jasa was arrested during the weekend and a judge could not set bond for several days.

Both Morrow and Sears testified that neither of them did anything to inhibit Jasa's ability to arrange independent testing. Morrow stated that inmates at the Lancaster County jail are allowed to make telephone calls and to have visitors. Both officers testified that they could not recall anyone ever coming to the jail to administer an independent blood test, but Morrow pointed out that he did not "stick with the people down at the jail" and that, in his role as a police officer, he would never see an arrestee receiving a visitor and did not know how the process worked.

Jasa testified that Morrow and Sears did not offer to transport him to the hospital for a blood test or to have someone come to the jail for a blood test, nor did they provide any information that he could use to obtain a blood test. Jasa confirmed that he was told he could arrange blood testing on his own, but said he had no idea whom to call or how to arrange

such testing at 2 a.m., especially since he is not from Lincoln. However, Jasa acknowledged that he used to live in Lincoln and had access to a telephone while he was in jail on the night of his arrest.

Over the 3½ days that Jasa spent in jail for the present offense, he made 45 telephone calls. The evidence showed that at 1:56 a.m. on the night of his arrest, he first called his current attorney, but was unsuccessful in reaching him. Jasa testified that he also called his brother and a friend several times to attempt to arrange for bond so that he could obtain an independent test upon his release and because, he testified, he did not realize he was nonbondable until several hours after his incarceration. Jasa acknowledged that, while in jail, he never attempted to contact a physician, a hospital, or anyone else to obtain a blood test.

Jasa testified that on the morning of the suppression hearing, he called several places in Lincoln to inquire whether they perform independent blood tests at the jail: the main desk, the laboratory, and the emergency room at a Lincoln hospital; the laboratory and the emergency room at another Lincoln hospital; and two other testing facilities, as well as the Lancaster County Detention Center's medical department. Jasa testified that one of the hospitals had referred him to the two other testing facilities. Jasa stated that he made his best effort to find a facility that would draw blood at the jail and that he spoke to about 15 people, but he did not obtain the names of the employees who fielded his calls. Jasa testified that each facility informed him that it does not come to the jail to perform independent blood tests.

The district court denied Jasa's motion to suppress. First, while the district court made the factual finding that Morrow observed Jasa's pickup weaving within his lane and crossing over the lane line with the driver's side tires, the district court ultimately relied on the observation of weaving alone, along with LFR's report, in determining that the traffic stop was justified by reasonable suspicion of criminal activity. Second,

the district court concluded that it was not improper under title 177 for the officers to "work[] together" to observe Jasa during the 15-minute period prior to the breath test. Further, the district court reasoned that even if the officers did not strictly comply with the 15-minute observation requirement, the 15-minute observation period is a "'technique'" rather than a "'method'" under title 177, and that thus, any deficiency in executing it would affect credibility, but not admissibility. Finally, the district court concluded that suppression of the breath test was not warranted under § 60-6,199 because, although the officers did not assist Jasa in obtaining independent testing, law enforcement personnel did not intentionally impede his ability to do so.

After overruling Jasa's motion to suppress, the district court conducted a jury trial. The district court received evidence of the chemical breath test result over Jasa's timely objections and overruled his renewed motion to suppress. The jury found Jasa guilty of DUI with an alcohol concentration of .15 or more.

The district court held an enhancement hearing and determined the current conviction to be Jasa's third DUI offense. The district court sentenced Jasa to 36 months' probation with various terms and conditions and 60 days in jail with credit for time served. Further, the district court revoked Jasa's operator's license for 5 years, with the possibility of obtaining an ignition interlock device after 45 days.

This appeal followed.

## ASSIGNMENTS OF ERROR

Jasa assigns that the district court erred in (1) finding reasonable suspicion to initiate the stop, (2) finding that the 15-minute observation period prior to the breath test had been properly executed pursuant to title 177, (3) finding no violation of § 60-6,199, and (4) not suppressing the breath test and allowing it to be offered into evidence.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. McCumber*, 295 Neb. 941, 893 N.W.2d 411 (2017).

[2] The meaning and interpretation of statutes and regulations are questions of law which an appellate court resolves independently of the lower court's conclusion. *State v. McIntyre*, 290 Neb. 1021, 863 N.W.2d 471 (2015).

## ANALYSIS

### Legal Basis for Traffic Stop

[3-5] Jasa asserts that the officers did not have a legal basis to stop his vehicle. He contends that LFR's tip and the officers' independent observations were insufficient to create reasonable suspicion. The Fourth Amendment guarantees the right to be free of unreasonable search and seizure. *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014). This guarantee requires that an arrest be based on probable cause and limits investigatory stops to those made upon an articulable suspicion of criminal activity. *Id.* A traffic stop requires only that the stopping officer have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. *Id.* In this context, if an officer has probable cause to stop a traffic violator, the stop is objectively reasonable. *Id.*

[6] A police officer has probable cause to stop a defendant's vehicle, independent of an anonymous tip, when the officer observes a traffic violation. See *State v. Sanders*, 289 Neb. 335, 855 N.W.2d 350 (2014). A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle.

*Id.* In reviewing a challenge to the legality of an automobile stop, the question is not whether the officer issued a citation for a traffic violation or whether the State ultimately proved the violation; instead, a stop of a vehicle is objectively reasonable when the police officer has probable cause to believe that a traffic violation has occurred. *Id.*

Here, Jasa claims that the traffic stop was not justified because he did not commit a traffic violation under § 10.14.110 of the Lincoln Municipal Code. That section of the code prohibits driving with "one front and rear wheel . . . on one side of [the lane] line and the other front and rear wheel . . . on the opposite side of the [lane] line for a distance more than is necessary to change from one traffic lane to the other with safety." Specifically, Jasa claims that his vehicle "did not straddle the [lane] line with both tires at the same time as required under the code." Brief for appellant at 18.

The State contends that Jasa committed a traffic violation which provided probable cause for the traffic stop. To support its position, the State first notes the district court's factual finding that Morrow observed Jasa's vehicle "weaving within his lane and at one point crossing over the lane line with the driver's side tires." Despite this factual finding by the district court, in its holding, the court relied upon the call from dispatch and Jasa's vehicle weaving within the lane as reasonable suspicion for the traffic stop. The State requests that we accept these factual findings, because on appeal, we review a trial court's factual findings for a motion to suppress based on a claimed violation of the Fourth Amendment for clear error. See *State v. McCumber*, 295 Neb. 941, 893 N.W.2d 411 (2017). Although the video is not entirely clear, Morrow testified that from his perspective, he observed both driver's side tires cross the lane line. We find it was not clearly erroneous for the district court to accept Morrow's testimony on this issue.

[7] Next, based upon these facts, the State argues that we should find probable cause for the traffic stop based upon a

violation of the law. And we do independently review whether the facts violate the Fourth Amendment protections as a question of law. See *State v. McCumber, supra*. With the district court's having found that Morrow observed both of Jasa's driver's side wheels cross the lane line, it was objectively reasonable to conclude that a traffic violation had occurred. Where the record adequately demonstrates that the decision of a trial court is correct—although such correctness is based on a ground or reason different from that assigned by the trial court—an appellate court will affirm. *State v. Huff*, 279 Neb. 68, 776 N.W.2d 498 (2009). Therefore, we find no error by the district court in concluding that reasonable suspicion justified the traffic stop.

ADMINISTRATION OF BREATH TEST
PURSUANT TO TITLE 177

[8] Jasa next disputes the admissibility of the chemical breath test results. The four foundational elements which the State must establish as foundation for the admissibility of a breath test in a DUI prosecution are as follows: (1) that the testing device was working properly at the time of the testing, (2) that the person administering the test was qualified and held a valid permit, (3) that the test was properly conducted under the methods stated by the Department of Health and Human Services, and (4) that all other statutes were satisfied. *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000). Jasa's contentions focus on the third foundational element.

Title 177 is the governing Department of Health and Human Services regulation in this case. Title 177 authorizes Class B permit holders to perform a chemical test to analyze a subject's breath for alcohol content using an approved method. See 177 Neb. Admin. Code, ch. 1, § 001.07B (2014). Title 177 further sets forth the "Operating Rules for Class B Permit," and provides, "To determine the alcohol content in breath, a Class B permit holder shall . . . [u]se the appropriate checklist . . . ." 177 Neb. Admin. Code, ch. 1, §§ 007.02 and 007.02B (2014).

Under title 177, the testing machine used here is among the "[a]pproved evidentiary breath testing methods and instruments . . ." for which the "[c]hecklist technique . . ." in attachment 16 is approved and required. 177 Neb. Admin. Code, ch. 1, §§ 008.01, 008.01A, and 008.01C (2014). As described above, attachment 16 consists of a checklist of tasks including, among other things, "[o]bserve the subject for 15 minutes prior to testing." At the bottom of the checklist is a line with the words "Permit Holder" underneath.

Here, Morrow observed Jasa for 15 minutes before Sears, the named permit holder, administered the chemical breath test. Jasa claims that the breath test was not properly conducted under the methods stated by the Department of Health and Human Services in title 177, because Sears failed to observe Jasa for 15 minutes prior to administering the test and instead relied upon Morrow's 15-minute observation of Jasa. Further, Jasa contends that Sears could not rely on the knowledge of another officer to satisfy the observation period required by attachment 16 of title 177, because he and Morrow did not discuss the 15-minute observation period conducted by Morrow before Sears administered the breath test.

Jasa points to *DeBoer v. Nebraska Dept. of Motor Vehicles*, 16 Neb. App. 760, 761, 751 N.W.2d 651, 654 (2008), where the Nebraska Court of Appeals referred to the checklist as a "form by regulation [that] must be completed by an officer when conducting a breath test." But that descriptive phrase occurred only in the background section of that particular opinion and was not part of the Court of Appeals' holding in *DeBoer*. Although it may be typical, and even the best practice, for one officer both to administer the breath test and to complete the checklist, title 177 does not require that one officer perform both duties.

In this instance, competent evidence at the suppression hearing established that each requirement of attachment 16 had been performed. Morrow, a Class B permit holder, testified that he personally observed Jasa for the entire 15-minute

observation period and perceived nothing that would affect the accuracy of the test administered by Sears. Morrow further verified that he was present for the breath test and completed attachment 16, which shows that each foundational requirement had been met; and other than addressing the manner of executing the 15-minute observation period, Jasa presented no evidence or arguments to challenge the form's validity. Based on this evidence, we conclude the district court did not err in admitting the chemical breath test result, despite Jasa's assertions that it lacked sufficient foundation under title 177.

We digress to note the district court's finding that even if the officers had not strictly complied with title 177, the breath test results were admissible, because the 15-minute observation period was a technique rather than a method, and, as such, any failure to strictly adhere to it affected only the weight and credibility of the evidence, not its admissibility. In reaching this conclusion, the district court cited *State v. Miller*, 213 Neb. 274, 281, 328 N.W.2d 769, 773 (1983), where we stated, "[f]ailure to comply with a technique is not a failure to prove a foundational element, but affects weight and credibility only." Jasa, however, argues that the analysis in *Miller* does not apply in this instance, because *Miller* analyzed a prior rule of the then Department of Health's rules and regulations, rather than title 177. Further, Jasa contends that under title 177, "methods" and "techniques" are intertwined and thus, no distinction between the two should apply here.

In reaching our conclusion in *Miller*, we distinguished between method and technique, as those terms were expressly defined in the prior rule. But before arriving at that distinction, we stated that in order to admit the results of a chemical test, the statutory foundation must be met. We determined that such foundation was satisfied, and not until later in the opinion did we undertake the discussion of "method" and "technique" to address a requested jury instruction that invited the jury to assess the admissibility of the evidence. Therefore, the key question is whether the State proved that the express

requirements of the Department of Health and Human Services have been fulfilled, and here, we have answered that question in the affirmative. Having thus concluded, we need not delve into any distinction between methods and techniques.

### Opportunity for Independent Chemical Test/Admissibility Under § 60-6,199

Next, Jasa claims that the district court erred when it found that the officers had not violated his statutory right to an independent blood test pursuant to § 60-6,199. Section 60-6,199 provides:

> The peace officer who requires a chemical blood, breath, or urine test or tests pursuant to section 60-6,197 may direct whether the test or tests shall be of blood, breath, or urine. The person tested shall be permitted to have a physician of his or her choice evaluate his or her condition and perform or have performed whatever laboratory tests he or she deems appropriate in addition to and following the test or tests administered at the direction of the officer. If the officer refuses to permit such additional test to be taken, then the original test or tests shall not be competent as evidence. Upon the request of the person tested, the results of the test or tests taken at the direction of the officer shall be made available to him or her.

In *State v. Dake*, 247 Neb. 579, 529 N.W.2d 46 (1995), we applied the language of § 60-6,199, then codified as Neb. Rev. Stat. § 39-669.09 (Cum. Supp. 1992). We found that an officer had no statutory duty to transport an in-custody defendant to the hospital for an independent blood test. In *Dake*, we also endorsed the view that while "the police cannot hamper a motorist's efforts to obtain independent testing, they are under no duty to assist in obtaining such testing beyond allowing telephone calls to secure the test." 247 Neb. at 584, 529 N.W.2d at 49.

Here, Jasa requested the opportunity to undergo an independent blood test, and Morrow informed him that jail staff

would allow him access to the telephone to make the necessary arrangements. Jasa's access to the telephone began at approximately 2 a.m., shortly after officers administered the chemical breath test, but, despite making 45 telephone calls, he did not try to contact a hospital or physician. Instead, he attempted, unsuccessfully, to make arrangements for bond.

On the morning of the suppression hearing, Jasa called hospitals and other entities to inquire about a blood test. Jasa testified that he learned that no entity he contacted comes to the jail to conduct independent blood tests. Notably, Jasa did not identify any of the individuals who fielded his calls, nor, as the State points out, does this evidence categorically establish that Jasa could not have been tested at the jail. It merely shows that Jasa's "best efforts" on the morning of the suppression hearing were fruitless.

In the instant case, Jasa was provided telephone access, but, whether through misunderstanding or calculated choice, he did not use it to arrange for timely independent testing. Even if confusion about bond influenced Jasa's failure to arrange for a timely independent blood test, any such misfortune did not arise due to the fault of law enforcement, who advised him that he would remain in jail until his court date and that he would have to arrange for someone to administer a blood test at the jail. See *People v. Kirkland*, 157 Misc. 2d 38, 595 N.Y.S.2d 905 (1993) (if driver cannot obtain test, through no fault of police, it is generally considered driver's misfortune). Instead, the officers in this case fulfilled the requirements of § 60-6,199 as applied in *Dake*: They did not hamper Jasa's ability to obtain an independent test, and they assisted him by allowing him to make telephone calls to secure it.

Despite Jasa's failure to attempt to arrange for a timely independent test, he argues that our holding in *State v. Dake, supra*, is distinguishable from his situation because he later attempted to contact hospitals and other entities about an independent blood test and none of them performed such tests at the jail. He also claims *Dake* is distinguishable because he

could not bond out for 3 days, whereas the defendant in *Dake* bonded out within a few hours. Under the circumstances in this case, Jasa believes that the intent of § 60-6,199 is defeated if the officers are not required to do more than provide access to a telephone.

Jasa relies on cases from other jurisdictions. He cites *Hedges*, 143 Idaho 884, 154 P.3d 1074 (Idaho App. 2007). But in *Hedges*, an Idaho court held that "the police . . . have a duty not to interfere with or affirmatively deny a defendant access to a telephone once a request has been made to make telephonic arrangements for an independent [blood alcohol content (BAC)] test," but "no duty to administer a second BAC test or otherwise participate in arranging an independent BAC test on behalf of the defendant" and no duty to "transport a defendant to a medical facility to obtain an independent BAC test." 143 Idaho at 888, 154 P.3d at 1078.

Jasa also points to *Unruh v. State*, 669 So. 2d 242, 243-44 (Fla. 1996), where the Supreme Court of Florida found:

> [L]aw enforcement must render reasonable assistance in helping a DUI arrestee obtain an independent blood test upon request. In some cases, minimal aid such as providing access to a telephone and directory will be sufficient; in others, more active assistance such as transporting the arrestee to a blood testing facility will be necessary.

However, unexplained by Jasa, is what would constitute reasonable assistance if we adopted the holding in *Unruh v. State, supra*. For example, does the officer need to assist an extremely intoxicated person who cannot even conduct a telephone call, does the officer order medical personnel to conduct an independent test if they refuse, and who is liable for the costs or if an injury occurs? Adopting any standard beyond allowing a defendant to make his or her own arrangements would add requirements to § 60-6,199 which are not present and would lead to confusion for law enforcement and medical personnel and inconsistencies in applying the law. See *State*

*v. Rodriguez*, 288 Neb. 714, 850 N.W.2d 788 (2014) (it is not within appellate court's province to read meaning into statute that is not there).

[9,10] In this instance, even if we ignored Jasa's failure to timely attempt to arrange for an independent test, it would not obviate the fact that the principle of *State v. Dake*, 247 Neb. 579, 529 N.W.2d 46 (1995), comports with § 60-6,199. Statutory language is to be given its plain and ordinary meaning. *State v. Arizola*, 295 Neb. 477, 890 N.W.2d 770 (2017). And we will not look beyond a statute to determine the legislative intent when the words are plain, direct, or unambiguous. *State v. Wood*, 296 Neb. 738, 895 N.W.2d 701 (2017). Clearly, § 60-6,199 allows any "person tested . . . to have a physician . . . evaluate his or her condition and perform or have performed whatever laboratory tests he or she deems appropriate." But the officer must "refuse[] to permit"—that is, deny authorization or consent for—such additional test to trigger the suppression of any officer-directed test. Since our holding in *Dake* over two decades ago, our Legislature has not revisited the language in § 60-6,199. The principle that "the police cannot hamper a motorist's efforts to obtain independent testing" and "are under no duty to assist in obtaining such testing beyond allowing telephone calls to secure the test" is still a reasonable statement of the law. *State v. Dake*, 247 Neb. at 584, 529 N.W.2d at 49**.** Accordingly, the district court did not err in finding no violation of the statutory rights afforded to Jasa by § 60-6,199.

[11] Jasa further claims a violation of his due process rights because he was denied the opportunity to obtain exculpatory evidence through an independent blood test. However, he did not raise this issue before the district court, and in appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court. *State v. Dean*, 270 Neb. 972, 708 N.W.2d 640 (2006). Therefore, we will not consider this issue on appeal.

### SUFFICIENCY OF EVIDENCE

Jasa argues that if we conclude that the district court erred in denying his motion to suppress, the evidence at trial was insufficient to support his conviction for the crime charged. However, having found that the district court did not err in denying the motion to suppress, we need not consider this assignment of error. *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

### CONCLUSION

For the reasons set forth above, we affirm.

AFFIRMED.