Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/06/2026 08:09 AM CST

State of Nebraska, appellee, v.
Levi W. Weber, appellant.
___ N.W.3d ___

Filed March 6, 2026.    No. S-25-044.

1. **Constitutional Law: Search and Seizure: Motions to Suppress:
   Appeal and Error.** When reviewing a trial court's ruling on a motion
   to suppress based on a claimed violation of the Fourth Amendment, an
   appellate court applies a two-part standard of review. Regarding histori-
   cal facts, an appellate court reviews the trial court's findings for clear
   error, but whether those facts trigger or violate Fourth Amendment pro-
   tections is a question of law that is reviewed independently of the trial
   court's determination.
2. **Statutes: Appeal and Error.** Statutory interpretation is a question of
   law that an appellate court resolves independently of the trial court.
3. **Constitutional Law: Search and Seizure: Investigative Stops:
   Arrests: Probable Cause.** The Fourth Amendment guarantees the right
   to be free of unreasonable search and seizure. This guarantee requires
   that an arrest be based on probable cause and limits investigatory stops
   to those made upon an articulable suspicion of criminal activity.
4. **Investigative Stops: Motor Vehicles: Probable Cause.** A traffic viola-
   tion, no matter how minor, creates probable cause to stop the driver of
   a vehicle.
5. **Appeal and Error.** In determining whether a trial court's findings of
   historical fact are clearly erroneous, an appellate court does not reweigh
   the evidence or resolve conflicts in the evidence, but, rather, recognizes
   the trial court as the finder of fact and takes into consideration that it
   observed the witnesses.
6. **Statutes: Appeal and Error.** Statutory language is to be given its plain
   and ordinary meaning, and an appellate court will not resort to inter-
   pretation to ascertain the meaning of statutory words which are plain,
   direct, and unambiguous.

7. **Statutes: Legislature: Intent.** In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

8. **Statutes.** It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

9. **Drunk Driving: Blood, Breath, and Urine Tests: Police Officers and Sheriffs.** Neb. Rev. Stat. § 60-6,199 (Reissue 2021) does not require an arresting officer to inform the person to be tested of his or her right to obtain an evaluation by an independent physician and additional testing.

Appeal from the District Court for Seward County, James C. Stecker, Judge, on appeal thereto from the County Court for Seward County, C. Jo Petersen, Judge. Judgment of District Court affirmed.

Matthew K. Kosmicki for appellant.

Michael T. Hilgers, Attorney General, Nathan A. Liss, and Danielle Jewell, Senior Certified Law Student, for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Funke, C.J.

## INTRODUCTION

Under Neb. Rev. Stat. § 60-6,199 (Reissue 2021), motorists who are required by law enforcement officers to submit to chemical tests of their blood, breath, or urine for the purpose of determining the concentration of alcohol or the presence of drugs can obtain independent testing in addition to and following the tests administered at the direction of the officer. If the officer "refuses to permit such additional test to be taken," the original test or tests are not competent as evidence.[1]

---

[1] § 60-6,199. See, also, *State v. Dake*, 247 Neb. 579, 529 N.W.2d 46 (1995) (permitting requested independent test is foundational to admission into evidence of result of breath test performed by State).

This appeal from the district court for Seward County, Nebraska, sitting as an intermediate appellate court, raises a question of first impression regarding whether an officer who gratuitously, but mistakenly, advises a motorist about when an independent test may be obtained effectively refuses to permit an independent test, such that the results of the motorist's original test must be suppressed. We conclude that the motorist's statutory right to an independent test was not violated under these circumstances and that his other arguments are without merit. As such, we affirm the order of the district court, affirming the judgment of the county court.

## BACKGROUND

### Weber's Encounter With Law Enforcement

The present appeal arises from an encounter that Levi W. Weber had with Deputy Anthony Gann and Sgt. Troy Schaefer of the Seward County sheriff's office at approximately 1 a.m. on July 4, 2023. The following description of that encounter is based on the evidence adduced at the hearing on Weber's motion to suppress and at the trial. It includes only those facts necessary for our analysis. Where relevant, additional background is provided later in the opinion.

Gann and Schaefer were standing outside their vehicles and talking after completing a traffic stop. The officers were at the intersection of Priam and Achilles Streets in Cordova, Nebraska, with their vehicles parked nearby. As they stood there, they observed a vehicle, later determined to be driven by Weber, turn onto Achilles Street. The officers would subsequently testify that the vehicle turned without signaling and then moved in a "slalom pattern" or "drastically swerve[d]" as it proceeded toward them, although Weber would contest both those claims. Gann and Schaefer would also testify that when Weber reached the intersection, he stopped and rolled down the vehicle's passenger-side window, actions that they took to mean the encounter was "consensual" and the driver

"wanted to speak" with them, although Weber would dispute those claims, too.

Gann approached the vehicle and observed that Weber had red, bloodshot, watery eyes and a "closed beer can" inside the front cab area of the vehicle and that he spoke slowly, loudly, and with "somewhat of a slur." Based on those observations and the vehicle's driving pattern, Gann asked Weber to step out of the vehicle with the intent of initiating a driving under the influence (DUI) investigation. During the course of that investigation, Weber said that he had a bottle of whiskey in his vehicle, that he had been drinking whiskey and soda, and that his last drink was approximately 1 hour before the encounter. Based on the results of the investigation, Weber was placed under arrest at 1:56 a.m. and transported by Gann to the Seward County Detention Center. Weber's vehicle was towed, and an inventory of his vehicle revealed an open bottle of whiskey on the front passenger seat.

Gann and Weber arrived at the detention center at approximately 2:25 a.m. Shortly after they arrived, Gann advised Weber that he was requiring Weber to submit to a chemical breath test to determine the concentration of alcohol in his body. Weber had questions about the advisement form, which also addressed blood and urine tests. Weber said that he would "let [Gann] take blood or urine," but that Gann had already taken a sample of his breath. Thereafter, there was "a lot of discussion back and forth" between Weber and Gann about the type of test to be administered. However, Weber ultimately consented to a breath test, which was administered at 2:53 a.m. That test indicated Weber's blood alcohol content was .131 grams of alcohol per 210 liters of breath.

After the test was completed, Gann escorted Weber to the booking area. As they walked there, Weber again asked Gann whether he got a blood or urine test. Gann told Weber that he did not. Weber asked the reason for this. Gann said, "Because we don't need to do it. . . . [I]f you want to seek your own independent blood test afterwards, you're welcome to do so."

Weber then asked, "[H]ow soon afterwards?" Gann replied, "As soon as you get out. If you want to do your own blood test, that's fine." On appeal in the present matter, the parties agree that this latter statement was incorrect insofar as it suggested that Weber could not obtain an independent test until he was released from the detention center.

At 3:15 a.m., Gann turned Weber over to the staff of the detention center, who commenced booking Weber into the facility. The booking process was completed at 6:17 a.m. There is nothing in the record to indicate why the booking process took 3 hours.

Shortly after booking was completed, Weber made two telephone calls to his father regarding bond and related matters.

Weber was released from the detention center at 8:46 a.m. after posting bond. Subsequently, a complaint was filed in the county court for Seward County charging Weber with DUI and an open container violation.

## MOTION TO SUPPRESS

Weber pleaded not guilty and filed a motion to suppress "any and all statements and evidence obtained by law enforcement officers regarding th[e] case" based on alleged violations of his constitutional rights, including his rights under the Fourth Amendment to the U.S. Constitution and the corresponding provisions of the Nebraska Constitution.[2] Weber also argued that the results of his original breath test should be suppressed because law enforcement "hindered" him from exercising his statutory right to an independent test.

A hearing was held, at which the county court received evidence consistent with the foregoing description of Weber's encounter with law enforcement. At the hearing, counsel for Weber specifically questioned officers about their testimony that Weber turned his vehicle without signaling, Weber's vehicle weaved from one side of the road to the other, and Weber

---

[2] See Neb. Const. art. I, § 7.

voluntarily spoke with them. However, Gann and Schaefer maintained that they were in a position to see whether Weber had used a turn signal and that they saw no signal. In addition, Gann, who was the only one questioned about this matter, opined that the "flicker" that can be seen on a video recording of the encounter was Weber's vehicle lights glimpsed through vegetation, and not a turn signal. Schaefer similarly resisted the suggestion that a vehicle that moved as the officers claimed Weber's vehicle had moved would have gone off the road and into a ditch, although Gann's comments on that matter were less clear. In addition, both officers maintained that they took no action to signal Weber to stop and that they were not blocking the intersection.

Weber testified too, although his testimony did not address his initial encounter with law enforcement. Weber said that he asked to make a telephone call "[s]hortly after" Gann left the detention center and before Weber was placed in a holding cell for booking, but that he was not given an opportunity to do so until approximately 6:20 a.m. Weber conceded that he did not ask his father to contact a hospital or find a doctor who could come to the detention center to administer a blood test. However, Weber said that no one "ever explain[ed] to [him] that [he] could arrange for a blood test from inside the jail" and that he did not understand how he could have done so.

After the hearing, the county court overruled Weber's motion to suppress. The county court began by rejecting Weber's claim that the "stop of [his] vehicle was invalid" because the officers had no basis for stopping him. The county court observed that "courts have long held" that the stop of a vehicle is objectively reasonable when the officer has probable cause to believe that a traffic violation has occurred and that traffic violations, no matter how minor, create probable cause to stop the driver. Here, the county court said that "[t]he testimony of the [officers] was that [Weber] made a turn without signaling the same." As such, the county

court reasoned that the traffic violation of failure to signal, "as testified to by the [officers]," was valid grounds to stop Weber's vehicle.

The county court took a similar view of Weber's motion to suppress based on the alleged violation of his statutory right to an independent test. Apparently focusing on Weber's initial conversation with Gann at the detention center, the county court stated that when viewed "in its entirety," the testimony and video recordings showed that Weber did not seek an independent test, but, rather, sought to have Gann perform "all three tests"—blood, breath, and urine. According to the county court, "[t]he only time that it can even be said that [Weber] makes any comment about getting his own independent test is at the very end" of his contact with Gann, when Gann raised the matter of an independent test. However, the county court said that Gann "[was] not required to so advise" and that there was no further inquiry by Weber and no further interaction between Weber and Gann. The county court also noted that there was testimony that Weber was allowed access to, and in fact used, the "jail telephone," but "no testimony as to whether [he] made calls to obtain an independent test," despite being given the opportunity to do so. As such, the county court concluded that nothing in the conversation between Weber and "the officers" hampered or prohibited Weber from obtaining an independent test.

### Trial and Sentencing

A bench trial was subsequently held in the county court, with all the evidence submitted by stipulated exhibits. At the trial, Weber renewed his motion to suppress in order to preserve it for appeal. Weber was convicted of DUI and an open container violation. He was subsequently sentenced to 6 months' probation with various terms and conditions, including a $500 fine and a 60-day revocation of his license, for the DUI offense and fined $50 for the open container violation.

### APPEAL TO DISTRICT COURT

Weber appealed to the district court, assigning, summarized and in relevant part, that the county court erred in overruling his motion to suppress on constitutional and statutory grounds. The district court affirmed the judgment of the county court, apparently under the following standard of review: "Propositions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision below."

As to Weber's constitutional claim, the district court agreed with the county court that the stop of a vehicle is objectively reasonable when an officer has probable cause to believe a traffic violation has occurred. Here, the district court said that "[t]he testimony of the [officers] was that [Weber] made a turn without signaling the same." The district court also opined that its review of the video recordings showed that Weber "voluntarily stopped his vehicle," rolled down his window, and engaged in a "consensual conversation" with Gann, during which Gann smelled alcohol—a smell that, in combination with Gann's observations of Weber's driving, created reasonable suspicion for Gann to ask Weber to step out of the vehicle and for Gann to initiate a DUI investigation. The district court noted Weber's argument that the officers' vehicles were parked in such a way that he could not proceed through the intersection. However, the district court rejected that argument based on its review of the video recordings. The district court then reiterated that the officers observed a traffic violation and concluded that the county court properly overruled the motion to suppress as it related to Weber's initial encounter with Gann and Schaefer.

The district court similarly concluded that the county court did not err in overruling Weber's motion to suppress as it related to the independent test. In so doing, the district court noted Weber's argument that Gann's "misstatement of the law hampered [his] efforts to obtain an independent test." However, the district court observed that Weber "cite[d] no caselaw that indicates that a partial[ly] incorrect statement is sufficient to

constitute" hampering or hindering under § 60-6,199. Instead, relying on *State v. Dake*[3] and *State v. Jasa*,[4] the district court reasoned that the case law "clearly reflects that the only responsibility of law enforcement is to allow phone calls to be made. Law enforcement has no other responsibility to assist a [motorist] in obtaining an independent test." Here, the district court said that law enforcement did not deny Weber an opportunity to obtain an independent test, because "[he] had access and used the telephone. [He] had [the] opportunity to obtain an independent test but did not obtain one."

Weber timely appealed the order of the district court. Thereafter, the State petitioned to bypass review by the Court of Appeals in part on the grounds that the case involved an issue of first impression as to whether Gann's "gratuitous but partially incorrect statement about the right to an independent chemical test runs afoul of § 60-6,199 and triggers suppression of the original chemical test." We granted the State's petition and moved the matter to our docket.[5]

## ASSIGNMENTS OF ERROR

Weber assigns, restated, that the district court erred by affirming the county court's order overruling his motion to suppress because (1) he was seized in violation of the Fourth Amendment and the corresponding provision of the Nebraska Constitution, and (2) Gann "hindered" or "denied" his right to an independent test under § 60-6,199. We hereinafter reference the first of these claims as Weber's Fourth Amendment claim, because article 1, § 7, of the Nebraska Constitution is phrased identically to the Fourth Amendment and has previously been construed to afford no greater protections against governmental searches and seizures than its federal counterpart.[6]

---

[3] *Dake, supra* note 1.

[4] *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017).

[5] See Neb. Rev. Stat. § 24-1106(2) (Cum. Supp. 2024).

[6] *State v. Hoehn*, 316 Neb. 634, 6 N.W.3d 487 (2024).

## STANDARD OF REVIEW

[1] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[7] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that is reviewed independently of the trial court's determination.[8]

[2] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[9]

## ANALYSIS

### Motion to Suppress on Fourth Amendment Grounds

In his first assignment of error, Weber challenges the district court's conclusion that the county court did not err in overruling his motion to suppress on Fourth Amendment grounds. Weber claims that the district court applied the incorrect standard of review in affirming the order of the county court. Weber also claims that the district court (like the county court before it) misconstrued the evidence in concluding that there was no violation of his Fourth Amendment rights. The State, in contrast, argues that the district court did not err in agreeing with the county court that Weber's Fourth Amendment rights were not violated.

[3] The Fourth Amendment guarantees the right to be free of unreasonable search and seizure.[10] This guarantee requires that an arrest be based on probable cause and limits investigatory

---

[7] *State v. Falcon*, 319 Neb. 911, 25 N.W.3d 462 (2025).

[8] See *id.*

[9] *Streck, Inc. v. Ryan, ante* p. 638, 29 N.W.3d 782 (2026).

[10] *Jasa, supra* note 4.

stops to those made upon an articulable suspicion of criminal activity.[11]

[4] However, not all encounters between police and citizens constitute seizures within the realm of Fourth Amendment protection.[12] Police-citizen encounters that involve no restraint of the citizen's liberty, but, rather, the citizen's voluntary cooperation, elicited through noncoercive questioning, do not "'rise to the level of a seizure'" and, as such, are "'outside the realm of Fourth Amendment protection.'"[13] Moreover, even when a police-citizen encounter *does* constitute a seizure, it could still be objectively reasonable if the officer has specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime, or if the officer has probable cause to believe that a person has committed or is committing a crime.[14] As is relevant here, a traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle.[15]

The parties here raise various arguments as to whether the encounter between Weber and the officers was a seizure within the realm of Fourth Amendment protection, whether there was reasonable articulable suspicion of DUI, and whether there was probable cause to believe Weber had committed a traffic violation. However, we need not resolve most of those disputes. Nor need we resolve Weber's claim that the district court applied the incorrect standard of review. This is because, even assuming that the district court applied the incorrect standard of review and that the encounter between Weber and the officers was a seizure, the district court cannot be said to have erred in affirming the county court's conclusion that

---

[11] *Id.*

[12] See *State v. Drake*, 311 Neb. 219, 971 N.W.2d 759 (2022).

[13] *Id*. at 229, 971 N.W.2d at 769.

[14] See *Drake, supra* note 12.

[15] *State v. Perry*, 318 Neb. 613, 17 N.W.3d 504 (2025).

there was probable cause to stop Weber for failing to signal before turning, in violation of Neb. Rev. Stat. § 60-6,161 (Reissue 2021).[16]

In arguing otherwise, Weber claims that the district court and the county court "clearly erred" in concluding that there was probable cause to stop him for a traffic violation.[17] Weber maintains that the courts below simply "defer[red]" to the officers' testimony that he turned his vehicle without signaling and "ignored" other allegedly "more probative and relevant" evidence that he claims "refuted" the officers' testimony.[18] In particular, Weber points to video recordings and other exhibits that he claims show, in relevant part, that the officers could not have observed whether he signaled before turning and that he actually signaled before turning. Weber also argues that Schaefer's testimony that Weber turned without signaling should be "disregard[ed]" because Schaefer did not mention any failure to signal by Weber in his supplemental report regarding the encounter.[19]

[5] We see no clear error here. Weber complains of the district court's affirmance of the trial court's findings of historical fact in connection with his motion to suppress and would have us find that certain testimony was "not credible" based on alleged discrepancies in the evidence.[20] That request misunderstands the role of an appellate court. As we have repeatedly stated, in determining whether a trial court's findings of historical fact are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts

---

[16] See, e.g., *Sebade v. Sebade, ante* p. 398, 28 N.W.3d 19 (2025) (appellate court has discretion to affirm, as it deems appropriate, correct result that was reached below for wrong reason).

[17] Brief for appellant at 8.

[18] *Id*. at 15.

[19] *Id*. at 16.

[20] *Id*. at 17.

in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses.[21]

We also observe that the video recordings and other exhibits on which Weber relies are less conclusive than he suggests, especially when considered in conjunction with the totality of the officers' testimony. The officers testified not only that they observed a traffic violation, but also that they were in a position to observe whether Weber signaled before turning and saw no such signal. In addition, Gann testified that the "light" seen in the video recording "flickering from" Weber's vehicle[22]—which Weber asserts was his use of a turn signal— was the vehicle's lights glimpsed through vegetation, not a turn signal. And Schaefer explained that he did not include the traffic violation in his supplemental report because he did not "think it was important" insofar as he viewed the "stop [as] a consensual encounter."

Any suggestion that the courts below failed to review the video recordings is similarly misplaced. The district court did, in fact, refer to "the video" several times in its discussion of Weber's motion to suppress. Granted, those references pertain to Weber's meeting with the officers at the intersection, and not the traffic violation preceding that meeting. However, the references make clear that the district court considered other evidence beyond the officers' testimony. The county court similarly mentioned "the video" in its order denying Weber's motion to suppress.

Weber raises similar arguments as to the officers' testimony that his vehicle weaved from side to side as it progressed down Achilles Street, with the apparent intent of refuting the claim that there was reasonable articulable suspicion that

---

[21] *State v. Briggs*, 308 Neb. 84, 953 N.W.2d 41 (2021).

[22] Brief for appellant at 16.

Weber was driving while under the influence.[23] However, we need not address those arguments because we conclude that the district court did not err in affirming the county court's conclusion that there was probable cause to believe that Weber had committed a traffic violation.

## MOTION TO SUPPRESS UNDER § 60-6,199

In his second assignment of error, Weber challenges the district court's conclusion that the county court did not err in overruling his motion to suppress evidence of his chemical breath test under § 60-6,199. Weber argues that the district court erred in failing to realize that the county court was mistaken in concluding that he had not requested an independent test. Weber also argues that the district court "incorrectly appl[ied] the law with respect to independent blood tests" by failing to recognize that Gann "denied, hampered or prevented him" from obtaining an independent test.[24] In addition, Weber argues that the district court "misapplied the facts" in finding it "dispositive that [he] had access to a phone."[25] The State, on the other hand, argues that Weber did not request an independent test and that even if he were seen to have made such a request, the officers did not refuse to permit an independent test.

We see no conduct by the officers in this case that would require suppression of Weber's chemical breath test under § 60-6,199. In arguing otherwise, Weber points in part to Gann's failure to advise him that he would have access to a telephone and that he could or would (Weber uses both formulations here) have to make his own arrangements for an

---

[23] See, e.g., *Drake, supra* note 12 (because of its less intrusive character, investigatory stop, as defined in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), requires only that stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that person has committed or is committing crime).

[24] Brief for appellant at 17.

[25] *Id*. at 22.

independent blood test. Weber claims that such an advisement was "required" under § 60-6,199 and *Jasa*.[26] Weber also points to Gann's "incorrect statement" about when Weber could obtain an independent blood test.[27] Weber seems to suggest that insofar as Gann was mistaken about when a motorist could obtain an independent test, Gann failed in his duty under *State v. Albarenga*[28] to know the laws he was charged to enforce. Weber asserts that Gann's failures, individually and collectively, "hampered," "hindered," "prevented," "denied," or "effectively denied" Weber's right to obtain an independent test.[29]

Section 60-6,199 provides, in relevant part, that "[i]f the officer refuses to permit [an] additional test to be taken, then the original test or tests shall not be competent as evidence."

[6-8] Statutory language, like that quoted here, is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[30] In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[31] It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.[32]

We see nothing in the text of § 60-6,199, or in our prior opinions construing that statute, requiring Gann to inform Weber that he would be allowed access to a telephone and could or would have to make arrangements for someone to

[26] *Id*. at 21. See *Jasa, supra* note 4.

[27] Brief for appellant at 20.

[28] *State v. Albarenga*, 313 Neb. 72, 982 N.W.2d 799 (2022).

[29] Brief for appellant at 17, 18, and 20.

[30] *Streck, Inc., supra* note 9.

[31] *Id*.

[32] *Id*.

come to the detention center to take a blood sample. The statutory text itself does not purport to impose any duties on officers to assist motorists in obtaining an independent test, and we have previously relied on this factor in rejecting motorists' claims that officers should be seen to have certain duties (beyond allowing access to a telephone) under § 60-6,199.[33]

[9] We see nothing in *Jasa* to the contrary. Weber is correct that in *Jasa*, the motorist was advised that he "had a right to undergo independent testing but would have to procure and pay for it himself."[34] However, those were the facts of the case, and we recited them as such. We did not suggest that such an advisement was required; in fact, to do so would have been to overrule sub silentio a long line of cases concluding that § 60-6,199 and its predecessors do not require an arresting officer to inform the person to be tested of his or her right to obtain an evaluation by an independent physician and additional testing.[35]

We take a similar view of Weber's argument that Gann incorrectly stated when Weber could obtain an independent test and, in so doing, failed in his duty under *Albarenga* to know the laws he was charged with enforcing. As noted above, we have long and repeatedly taken the view that officers have no duty under § 60-6,199 and its predecessors to advise motorists of their right to an independent test.[36] Consistent with that

---

[33] See, e.g., *Jasa, supra* note 4 (looking to plain text of statute in rejecting motorist's claim that insofar as he could not be released on bond for several days due to nature of his offense and he subsequently learned that none of entities he contacted would have come to jail for an independent test, intent of § 60-6,199 would be defeated if officers were not required to do more than provide access to telephone).

[34] *Jasa, supra* note 4, 297 Neb. at 827, 901 N.W.2d at 320.

[35] See, e.g., *Heusman v. Jensen*, 226 Neb. 666, 414 N.W.2d 247 (1987); *State v. Klingelhoefer*, 222 Neb. 219, 382 N.W.2d 366 (1986); *State v. Miller*, 213 Neb. 274, 328 N.W.2d 769 (1983); *State v. Brittain*, 212 Neb. 686, 325 N.W.2d 141 (1982); *Zadina v. Weedlun*, 187 Neb. 361, 190 N.W.2d 857 (1971).

[36] See *id.*

view, we agree with the State that insofar as officers have no duty to advise motorists of their right to an independent test, they cannot be seen to have a duty to correctly advise motorists of that right. We also note that while we recited the principle that officers have a duty to know the law in *Albarenga*, we did so in rejecting the defendant's argument that the principle required the suppression of evidence obtained when the officer stopped the defendant for violating a municipal ordinance that we later determined was preempted by state law.[37]

Framing the conduct complained of as "hampering" or otherwise impeding the motorist's ability to obtain an independent test—rather than asserting an affirmative duty on the part of officers—does not change the analysis here. Weber is correct that in *Dake*, we agreed with courts in other jurisdictions that had construed statutes similar to § 60-6,199 to mean that "while . . . police cannot hamper a motorist's efforts to obtain independent testing, they are under no duty to assist in obtaining such testing beyond allowing telephone calls to secure the test."[38] However, subsequently, in *Jasa*, we looked to the language of the statute when reasoning that "the officer must 'refuse[] to permit'—that is, deny authorization or consent for—such additional test to trigger the suppression of any officer-directed test."[39] As such, we understand our subsequent statement in *Jasa* that the principle set forth in *Dake* regarding "'hamper[ing],'" assisting, and allowing telephone calls "[was] still a reasonable statement of the law" to mean only that purported "'hamper[ing]'" must be equivalent to a refusal to permit.[40] The conduct of which Weber complains was not a "refus[al] to permit" an independent test in that sense.[41] We likewise reject Weber's argument that we would

---

[37] See *Albarenga, supra* note 28.

[38] *Dake, supra* note 1, 247 Neb. at 584, 529 N.W.2d at 49.

[39] *Jasa, supra* note 4, 297 Neb. at 838, 901 N.W.2d at 326.

[40] *Id*.

[41] See § 60-6,199.

be "playing games with semantics" and reading § 60-6,199 "too strict[ly]," thereby undermining its intent, if we were to construe "refuse[al] to permit" in that statute to mean that officers "literally tell" the motorist that he or she cannot make a telephone call or "physically stop" the motorist from making a call.[42] Under the principles of statutory interpretation set forth above, we will not look beyond the statute to determine the legislative intent when the words are plain, direct, and unambiguous.[43] Here, the words of § 60-6,199 plainly, directly, and unambiguously prescribe that the officer must "refuse[] to permit" an independent test for the results of the initial test or tests to be excluded, and *Jasa* construed "'refuse[] to permit'" to mean to "deny authorization or consent for."[44] Since that opinion, nearly a decade ago, the Legislature has not revisited the language in § 60-6,199, suggesting it does not disagree with our assessment of what must occur for a motorist's initial test or tests to be suppressed.[45]

That leaves only Weber's argument that the district court "misapplied the facts" insofar as it found it "dispositive that [he] had access to a phone."[46] As we understand it, in concluding that he was not denied his right to an independent test, the district court focused on the fact that Weber had access to a telephone *after* the booking process was completed and did not use it to arrange for an independent test. Weber, in contrast, points to his own testimony at the suppression hearing that he asked to use a telephone at the start of the booking

---

[42] Brief for appellant at 9.

[43] *Inland Ins. Co. v. Lancaster Cty. Bd. of Equal.*, 316 Neb. 143, 3 N.W.3d 354 (2024), *modified on denial of rehearing* 316 Neb. 417, 4 N.W.3d 884.

[44] *Jasa, supra* note 4, 297 Neb. at 838, 901 N.W.2d at 326.

[45] See, e.g., *Perkins Cty. Bd. of Equal. v. Mid America Agri Prods.*, 317 Neb. 1, 8 N.W.3d 716 (2024) (where statute has been judicially construed and that construction has not evoked amendment, it will be presumed that Legislature has acquiesced in court's determination of Legislature's intent).

[46] Brief for appellant at 22.

process but was not allowed to do so until the booking process was completed, 3 hours later. Relatedly, Weber argues that any independent test he could have obtained at that point would have been "meaningless," given the passage of time since he consumed alcohol.[47]

In *Dake*, we did state that officers have a duty under § 60-6,199 to allow telephone calls to secure an independent test.[48] Here, however, despite Weber's testimony that he asked to use the telephone "[s]hortly after Gann had left and before [he] was put in the cell," the trial court made the factual determination that no request for an independent test was made. Under our standard of review, we find no clear error in that determination.[49]

## CONCLUSION

Because Weber's Fourth Amendment rights were not violated, and because officers did not refuse to permit Weber to obtain an independent test under § 60-6,199, we affirm the order of the district court, which affirmed the judgment of the county court.

Affirmed.

---

[47] *Id*. at 23.

[48] *Dake, supra* note 1.

[49] See, e.g., *Jones v. Colgrove*, 319 Neb. 461, 24 N.W.3d 1 (2025) (trial court did not abuse its discretion in not awarding child tax credit to father where it heard father's testimony on mother's alleged fraud in financial matters and impliedly did not find it credible).